# FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE AUG 2 7 2015



for CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on Aug. 27 2015

Ronald R. Carpenter
Supreme Court Clerk

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| AUTOMOTIVE UNITED TRADES ORGANIZATION, a non-profit trade association, | ) ) ) | |
| | ) | No. 89734-4 |
| Appellant, | ) ) | |
| v. | ) ) | En Banc |
| The STATE OF WASHINGTON; JAY INSLEE, in his official capacity as Governor of the State of Washington; ALAN HAIGHT, in his official capacity as Director, Washington State Department of Licensing, | ) ) ) ) ) ) ) ) ) | |
| Respondents. | ) ) | Filed AUG 2 7 2015 |

GONZÁLEZ, J.—After several Indian tribes successfully challenged imposition of state fuel taxes on tribal retailers, our legislature both authorized the governor to resolve fuel tax controversies with tribes by agreement and attempted to change state fuel tax law to avoid tribal immunity. Since then, the State and various tribes have signed many agreements under which the tribes agree to buy taxed fuel and the State agrees to refund a portion of the fuel tax

receipts to the tribes. An industry group has challenged the lawfulness of these agreements.[1] The trial court dismissed the case at summary judgment.

We must decide whether those agreements violate article II, section 40 of the Washington State Constitution, which limits the use of state fuel tax receipts to highway purposes, and whether the legislature improperly delegated legislative authority to the governor to negotiate and enter into those agreements. Without passing judgment on whether the legislature successfully moved the legal incidence of the tax away from tribal retailers, we affirm.

BACKGROUND

Washington State taxes fuel. LAWS OF 1921, ch. 173, § 2. Not long after the state began taxing fuel, the people approved the eighteenth amendment to our constitution. This provision limits the use of motor fuel taxes to "highway purposes," including "[r]efunds authorized by law for taxes paid on motor vehicle fuels." WASH. CONST. art. II, § 40(d).

Several Indian tribes in Washington State own and operate gas stations on tribal lands. Federal law limits the States' ability to tax tribes and tribal enterprises. COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 8.03[1][a], [b], at 696-97 (Nell Jessup Newton ed., 2012) (citing Richard D. Pomp, *The*

---

[1] Perhaps because the tribes are not parties to this case, whether the legislature has successfully avoided tribal immunity in the fuel tax arena has not been squarely litigated by the parties in this case or addressed in any published court opinion.

*Unfilled Promise of the Indian Commerce Clause and State Taxation*, 63 TAX.

L. 897 (2010)).

Conflict over the State's power to tax fuels sold on tribal land has

existed in this state since at least 1930. *See* Sale to Indian on Reservation of

Liquid Fuel as Taxable, 20 Op. Att'y Gen. 629-30 (1929-30) (advising the state

treasurer that sale to an Indian retailer on Indian land was taxable). Recent

years have seen many more tribal enterprises operating gas stations on tribal

land and many more conflicts between states and tribes regarding fuel taxes.

COHEN, *supra*, § 8.03[1][b], at 697 (citing *Okla. Tax Comm'n v. Chickasaw

Nation*, 515 U.S. 450, 456-62, 115 S. Ct. 2214, 132 L. Ed. 2d 400 (1995)). In

*Chickasaw Nation*, the United States Supreme Court resolved some of the

conflicts by holding that "when Congress does not instruct otherwise, a State's

excise tax is unenforceable if its legal incidence falls on a Tribe or its members

for sales made within Indian country." *Chickasaw Nation*, 515 U.S. at 453.

The *Chickasaw Nation* case sparked two legislative actions in the 1990s

that led to the conflict before us. First, in a very brief bill, the legislature

authorized the Washington State Department of Licensing to enter into deals

with the tribes to settle legal conflicts regarding fuel taxes "upon terms

substantially the same as those in the consent decree entered by the federal

district court (Eastern District of Washington) in *Confederated Tribes of the

Colville Reservation v. [Department of Licensing] et al.*" LAWS OF 1995, ch.

3

320, §§ 2-3. Under the consent decree, the tribes agreed to buy only fuel that had already been taxed, record whether they sold the fuel to tribal or nontribal members, and allow the State to review their records. In return, the State would "refund . . . the amount of motor vehicle fuel tax and special fuel tax that any seller, distributor or dealer of such fuels has paid to the State and passed on to . . . the Tribes," measured by gallons of such fuel used by the tribes or purchased by tribal members or businesses. Clerk's Papers (CP) at 1037-38 (consent decree).[2] Over the next few years, the State entered into similar agreements with the Lummi, Port Gamble S'Klallam, and Skokomish Tribes to refund fuel taxes to the tribes based on gallons used by the tribes or sold to tribal members. The State has entered agreements with many more tribes since then. Wash. State Dep't of Licensing, Tribal Fuel Tax Agreement Report: November 2014, at 2 (2014), http://www.dol.wa.gov/about/docs/2014-11-tribal-fuel-tax-rpt.pdf.

Second, several years later and in a much more expansive bill, our legislature attempted to move the legal incidence of the fuel tax away from retailers, including tribal retailers, by declaring that "the ultimate liability for

---

[2] Much of the record arrived at this court sealed, including the tribal fuel tax compacts that both the State and the tribes assert are publically available, Br. of Resp'ts at 2; Br. Amicus Curiae Indian Tribal Gov'ts at 16, and a federal injunction and consent decree that are available on the Internet. It is questionable whether these and many of the other documents in this case were properly sealed under GR 15, but since no party or intervener has challenged the sealing, whether it was appropriate is not before us. We modify the trial court's broad sealing order only to the extent necessary for a full statement of the case.

the tax imposed under this chapter [is] upon the motor vehicle fuel user, regardless of the manner in which collection of the tax is provided for." LAWS OF 1998, ch. 176, § 48. The act specifically carved out settlements and consent decrees already entered to settle fuel tax controversies with tribes. *Id.* The Squaxin Island and the Swinomish Indian Tribes challenged application of the 1998 amendments to them on the grounds that the legal incidence of the fuel tax still fell on their tribal retailers and thus the tax was unenforceable. *Squaxin Island Tribe v. Stephens*, 400 F. Supp. 2d 1250, 1251, 1261 (W.D. Wash. 2005). At the time, Washington used a tax-at-the-pump model where suppliers and/or distributors were responsible for seeing that the tax was paid and were entitled to recoup the moneys expended on taxes from the retailers. *Id.* at 1251-52 (citing former RCW 82.36.035 (2005); former RCW 82.36.160 (2005)). Judge Zilly of the United States District Court for the Western District of Washington took a hard look at the actual operation of the fuel tax statutes; found that notwithstanding the declaration from the legislature that responsibility for the tax fell on the consumer, the legal incidence of the tax still fell on the retailer because only the retailer was meaningfully legally responsible to pay it; and enjoined collection of the tax from the plaintiff tribes. *Id.* at 1255-62. Later, Judge Zilly entered a permanent injunction that said in part:

As a matter of federal law, the State of Washington's motor vehicle fuel taxes may not be applied to motor vehicle fuels, delivered to, received by, or sold by any retail fuel station that is owned by an Indian tribe, tribal enterprise, or tribal member and that is located within the tribe's Indian Country[.]

Defendant [State of Washington] is permanently enjoined from imposing or collecting motor vehicle fuel taxes, or otherwise seeking to enforce RCW chapter 82.36 with respect to motor vehicle fuels, delivered to, received by, or sold by Plaintiffs' retail fuel stations within their respective Indian Country.

CP at 494. The record suggests that at least as of the summary judgment hearing below, the injunction was still in effect.

After Judge Zilly's injunction issued, the legislature considered moving from a tax-at-the-pump model to a tax-at-the-rack model, in another attempt to put the legal incidence of the tax outside of Indian Country and on someone other than the retailer. S.B. 6785, at 5, 59th Leg., Reg. Sess. (Wash. 2006); S.B. REP. ON S.B. 6785, 59th Leg., Reg. Sess. (Wash. 2006). An attorney representing the Squaxin Island Tribe testified that if the bill passed, "tribes like Squaxin Island Tribe, and others, already are and will be looking at how to occupy the supplier position. Wherever you move the legal incidence of the tax, . . . if it falls on a tribe or its members on their own land . . . we're going to seek to occupy that position." CP at 530, 534 (transcript of testimony before Senate Transportation Committee on S.B. 6785). The bill did not pass.

After the 2006 legislative session ended, "the State, tribal representatives, and a variety of other stakeholders worked on a compromise that would allow the State to gain the efficiencies of moving the incidence of the fuel tax up to the supplier level." CP at 284. Meanwhile, the United States Supreme Court affirmed the imposition of a Kansas state distributor-level fuel tax on fuel that was later sold by tribal enterprises on tribal land, finding that Kansas had successfully imposed the legal incidence of the tax off the tribe and outside of the tribal lands. *Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 103, 126 S. Ct. 676, 163 L. Ed. 2d 429 (2005). In 2007, a tax-at-the-rack bill did pass, with the support of at least one Indian tribe. S.B. REP. ON S.B. 5272, at 3, 60th Leg., Reg. Sess. (Wash. 2007); CP at 545 (testimony of Kelly Cromin, representative of the Squaxin Island Tribe); LAWS OF 2007, ch. 515. A representative from Automotive United Trades Organization (AUTO) testified against the bill. S.B. REP. ON S.B. 5272, at 3. Perhaps as a result of the earlier negotiations, the law specifically authorized the governor or her designee to enter into fuel tax agreements with federally recognized tribes operating or licensing retail gas stations on their lands but no longer required the agreements to be "substantially similar" to the Colville Consent Decree, which had carried a fairly heavy record keeping burden. LAWS OF 2007, ch. 515, § 19 (codified at former RCW 82.36.450 (2007)); *see also* former RCW

82.38.310 (2007) (similar statute governing special fuel taxes).[3] The legislature

has directed that the agreements with the tribes require them to spend the

refunds on "[p]lanning, construction, and maintenance of roads, bridges, and

boat ramps; transit services and facilities; transportation planning; police

services; and other highway-related purposes," RCW 82.36.450(3)(b), and

include provisions "for audits or other means of ensuring compliance to certify

the number of gallons of motor vehicle fuel purchased by the tribe for resale at

tribal retail stations, and the use of fuel tax proceeds or their equivalent for the

purposes identified in (b) of this subsection," RCW 82.36.450(3)(c); *see also*

RCW 82.38.310 (imposing substantially similar requirements on special fuel

tax agreements).

Under the 2007 amendments, the motor fuel tax is imposed (1) when a

supplier removes fuel from a terminal rack and sells it to a distributor, (2) when

fuel is produced, (3) when fuel is imported, or (4) when fuel is blended in the

state, whichever comes first. LAWS OF 2007, ch. 515, § 2 (codified at RCW

82.36.020(1), (2)). The tribes agreed to purchase tax-burdened fuel in return

for a refund of 75 percent of the taxes paid, which approximated the percentage

of the fuel purchased by tribal members, along with other conditions outlined in

---

[3] These statutes, along with most of the statutes before the court today, were repealed effective July 1, 2015, while this case was pending at this court. LAWS OF 2013, ch. 225, §§ 501(64), 103, 130. Chapter 225 is an enormous bill that appears to coordinate disparate provisions of the fuel tax system across about 20 chapters and 8 titles of the RCW. The effect of these amendments is not before us. We note for the reader that subsequent citations to these statutes in this opinion are also to the former 2007 versions.

RCW 82.36.450. Similar provisions apply to special fuel taxes. Former RCW 82.38.030 (2007); RCW 82.38.310. After that 2007 bill passed, the State and the Squaxin and Swinomish Tribes settled their dispute and agreed to dismiss the pending appeal and to move to vacate the injunction. However, despite this new legislation and the parties' request, Judge Zilly declined to vacate his injunction. While AUTO asserts that the legal incidence of the tax has been moved up the distribution chain and away from the tribal retailers, it did not squarely present that issue below for the trial judge's resolution, did not designate it as an issue for review, and does not devote significant argument in support of it. No case has been drawn to our attention that has analyzed whether our legislature has successfully moved the legal incidence of the fuel tax from the retailer up the distribution chain.

The fact that no court has ever analyzed whether the 2007 legislation successfully moved the legal incidence of the tax off of tribal retailers is likely a consequence of the fact that since the legislation was passed, nearly all the litigation between the tribes and the State has been settled. Since 2007, the State has entered into many "75 Percent Refund/25 Percent (75/25) State Tax Agreements" with tribes who operate gas stations. *See* Tribal Fuel Tax Agreement Report, *supra*, at 1-2.[4] Under these 75/25 agreements, the tribes

---

[4] As of 2013, the State has entered into "75/25" agreements with the Chehalis Confederated Tribes, the Colville Confederated Tribes, the Jamestown S'Klallam Tribe, the Kalispel Tribe, the Nisqually Tribe, the Nooksack Tribe, the Port Gamble S'Klallam

agree to purchase fuel that has been taxed and receive a "refund" of 75 percent of the tax paid. The "operative effect" of the "75/25" agreements is that the state fuel tax is paid by the supplier/distributor of the fuel and included in the price the consumer pays at the pump. CP at 269. "After purchasing the tax burdened fuel, the tribe submits [an] invoice[] to DOL documenting the amount of fuel purchased and applies for a refund up to 75 percent of the amount that was paid for the state fuel tax." *Id.* Prior to the 2007 legislation, the State also entered into "Per Capita Agreements" with some tribes that appear to still be in effect.[5] Under the per capita agreements, the tribes are refunded a portion of the fuel taxes collected based on estimates of the amount of fuel purchased by tribal members on their reservations. Finally, the record suggests there are some consent decrees with other tribes on different terms. The State and the Yakama Nation have had ongoing conflicts about fuel taxes. Tribal Fuel Tax Agreement Report, *supra*, at 2-4.

While the State and the tribes seem to have largely settled (at least temporarily) their conflicts over fuel taxes, that harmony has not spread to all other players in the industry. AUTO, "a nonprofit trade association consisting

---

Tribe, the Puyallup Tribe, the Shoalwater Bay Tribe, the Skokomish Tribe, the Snoqualmie Tribe, the Spokane Tribe, the Squaxin Island Tribe, the Stillaguamish Tribe, the Suquamish Tribe, the Swinomish Tribe, the Tulalip Tribes, and the Upper Skagit Tribe. *See* Tribal Fuel Tax Agreement Report, *supra*, at 2. Many of these tribes appear as amici in this case.

[5] The State has entered into per-capita fuel tax agreements with the Lummi Nation, the Makah Tribe, the Muckleshoot Tribe, the Quileute Tribe, and the Quinault Nation. Tribal Fuel Agreement Report, *supra*, at 2.

of independent gasoline and automotive service retailers" brought this case seeking declaratory and injunctive relief and a writ of prohibition against the State to prevent it from making "refunds" of fuel taxes to the tribes from the Washington State Motor Vehicle Fund. CP at 1-2. It alleged in its complaint that the agreements with the tribes violate our constitution's limits on the use of fuel taxes, violate the privileges and immunities clause, and are the product of an unconstitutional delegation of legislative power to the executive. AUTO also contends that its members are specifically injured because "prices are substantially lower (in the range of 5 cents or more per gallon) at tribal retailers compared with similarly branded non-tribal retailers in the same region." *Id.* at 182. It alleges the lower prices are a result of the refunds.

In 2011, the State successfully moved to dismiss the case for failure to join the tribes as indispensable parties. *Auto. United Trades Org. v. State*, 175 Wn.2d 214, 221, 285 P.3d 52 (2012). Over a vigorous dissent, this court reversed. *Id.* at 235. We found that the tribes were necessary but not indispensable parties "whose joinder is not feasible due to tribal sovereign immunity" and that "equitable considerations allow this action to proceed in their absence." *Id.* at 220. The dissent concluded the tribes were indispensable parties that could not be joined and would have affirmed dismissal. *Id.* at 235-36 (Fairhurst, J., dissenting).

On remand, the parties proceeded to discovery, which centered on the various agreements with the tribes, the amount of money refunded to the tribes, and the way the tribes used that money. Discovery revealed that by the time this case went to summary judgment in 2013, tribes had received more than $150 million dollars in refunds from the State. Discovery results also suggest that the tribes may have used some of the refund money for a childcare development center, which appears to be outside the scope of the contractual provisions allowed by RCW 82.36.450(3)(b), though of course since the tribes are not parties to the case, this fact has not been tested. AUTO found evidence that tribal gas stations charged less than their competitors, though this fact is disputed and also has not been tested. The State presented a declaration from an expert who testified that he found no evidence that gas prices at tribal gas stations were consistently lower than their competitors and no evidence that tribes were subsidizing gas prices with the refunds.

Both parties moved for summary judgment on the merits. Perhaps because the tribes are not parties, the legal question whether the legal incidence of the tax still fell on tribal retailers was alluded to by both sides but not squarely confronted as an issue below. AUTO argued that under article II, section 40, "revenues from fuel taxes [must] be spent exclusively for the betterment of Washington's highway system," that the agreements with the tribes violated the privileges and immunities clause (an argument they do not

renew here), and that "the disbursements are the result of an unconstitutional delegation of authority" to the executive branch. CP at 324. The State's motion observes that that 2007 legislation moved the "incidence of motor vehicle fuel and special fuel up to the supplier/distributor level," *id.* at 267, but does not argue or concede that the State has moved the legal incidence of the fuel tax away from the tribal retailers.

Judge Godfrey concluded that article II, section 40 plainly allows for refunds and that the refunds at issue were properly authorized by the legislature. Verbatim Report of Proceedings (VRP) (Nov. 25, 2013) at 49-50. He denied AUTO's motion, granted the State's motion, and dismissed the case. We granted AUTO's motion for direct review. The Washington Policy Center has filed an amicus brief in support of AUTO. Fifteen tribes[6] have filed an amicus brief in support of the State.

ANALYSIS

This case is here on appeal from summary judgment. Our review is de novo. *Freeman v. State*, 178 Wn.2d 387, 393, 309 P.3d 437 (2013) (citing *Dowler v. Clover Park Sch. Dist. No. 400*, 172 Wn.2d 471, 484, 258 P.3d 676

---

[6] These tribes are the Confederated Tribes of the Chehalis Reservation, the Jamestown S'Klallam Tribe, the Kalispel Tribe of Indians, the Nisqually Indian Tribe, the Port Gamble S'Klallam Tribe, the Puyallup Tribe of Indians, the Shoalwater Bay Indian Tribe, the Skokomish Indian Tribe, the Spokane Tribe of Indians, the Squaxin Island Tribe, the Stillaguamish Tribe of Indians, the Suquamish Tribe, the Swinomish Indian Tribal Community, the Tulalip Tribes, and the Upper Skagit Indian Tribe. This is all but three of the tribes who, as of 2013, had 75/25 agreements with the State. Tribal Fuel Agreement Report, *supra*, at 2.

(2011)). In essence, plaintiffs are challenging the constitutionality of RCW 82.36.450, RCW 82.38.310, and related statutes that authorize executive officers to negotiate fuel tax refunds to tribes, and also the application of RCW 46.68.090, which directs the state treasurer to pay refunds from the motor vehicle fund before making other distributions. "'We presume statutes are constitutional and review challenges to them de novo.'" *Lummi Indian Nation v. State*, 170 Wn.2d 247, 257-58, 241 P.3d 1220 (2010) (quoting *City of Seattle v. Ludvigsen*, 162 Wn.2d 660, 668, 174 P.3d 43 (2007)). AUTO, as the challenger, bears the burden of showing unconstitutionality. *State v. Lanciloti*, 165 Wn.2d 661, 667, 201 P.3d 323 (2009) (citing *Heinsma v. City of Vancouver*, 144 Wn.2d 556, 561, 29 P.3d 709 (2001)).

## 1. ARTICLE II, SECTION 40

First, we are asked to decide whether it violates article II, section 40 of our constitution for the State to refund a portion of fuel taxes to the tribes pursuant to RCW 82.36.450 and RCW 82.38.310. Article II, section 40 provides in most relevant part:

> All . . . excise taxes collected by the State of Washington on the sale, distribution or use of motor vehicle fuel . . . shall be paid into the state treasury and placed in a special fund to be used exclusively for highway purposes. Such highway purposes shall be construed to include the following:
>
> . . . .

14

(d) Refunds authorized by law for taxes paid on motor vehicle fuels.

RCW 82.36.450(1) provides:

The governor may enter into an agreement with any federally recognized Indian tribe located on a reservation within this state regarding motor vehicle fuel taxes included in the price of fuel delivered to a retail station wholly owned and operated by a tribe, tribal enterprise, or tribal member licensed by the tribe to operate a retail station located on reservation or trust property. The agreement may provide mutually agreeable means to address any tribal immunities or any preemption of the state motor vehicle fuel tax.

RCW 82.38.310(1) makes similar provisions for agreements regarding special fuel taxes. The State argues, and the trial judge below agreed, that article II, section 40(d) of our constitution plainly allows for the refunds at issue. VRP (Nov. 25, 2013) at 50 ("That's about as plain as it gets in my book."). AUTO contends that the trial judge erred because "the disbursements here are not refunds, and they have not been authorized by law." Br. of Appellant at 25. The State agrees with AUTO that to qualify as a refund under article II, section 40, a disbursement must be a refund authorized by law. Br. of Resp'ts at 17. The parties disagree about the application of these principles.

AUTO's argument that the disbursements under the agreements from the motor vehicle fund are not properly refunds rests on two main contentions. First, it contends that to qualify as a refund, the original tax must have been paid even though it was not due. Br. of Appellant at 28 (citing *Tiger Oil Corp.*

15

*v. Dep't of Licensing*, 88 Wn. App. 925, 937, 946 P.2d 1235 (1997)). Amicus Washington Policy Center strongly supports this contention. Br. of Amicus Curiae Wash. Policy Center at 6-12. Second, to qualify as a refund, it "must provide a targeted and substantial benefit to the class of taxpayers who paid the tax but are exempted from it." Br. of Appellant at 28 (citing *Wash. Off Highway Vehicle All. v. State*, 176 Wn.2d 225, 235, 290 P.3d 954 (2012) (*WOHVA*) (Owens, J., lead opinion); *id.* at 241, 243 (J.M. Johnson, J., dissenting). It contends the disbursements to the tribes do not satisfy this standard. It also argues that the tribes are misusing the refunds and that there is insufficient statutory authorization for the refunds.

A. REFUNDS UNDER ARTICLE II, SECTION 40

First, AUTO contends that article II, section 40 refunds are limited to cases where the tax was paid by a taxpayer who did not owe it. While this is an interesting question, no Washington case has found such an implicit constitutional requirement. *Tiger Oil* does not establish that proposition. In relevant part, the Court of Appeals was considering a provision of chapter 82.38 RCW that granted interest on certain refunded taxes that were erroneously paid. *Tiger Oil Corp.*, 88 Wn. App. at 937 (citing RCW 82.38.180(3)). The *Tiger Oil* court had no occasion to consider the deep nature of refunds under article II, section 40. Nor did the other cases called to our attention, *WOHVA*, 176 Wn.2d 225, and *Northwest Motorcycle Ass'n v.*

*Interagency Committee for Outdoor Recreation*, 127 Wn. App. 408, 110 P.3d 1196 (2005).

More importantly, AUTO has not established that the tribes were legally obligated to pay the tax outside of their contractual agreement to do so. Thus, a factual predicate for our consideration of this issue is not present. Whether the legislature has overcome tribal immunity turns on whether the legal incidence falls on the tribe. *Chickasaw Nation*, 515 U.S. at 458-59. This was not meaningfully briefed or considered at the trial court level, squarely presented as an issue for review, or argued in the briefs. We leave for another day, with the proper parties, whether the State successfully moved the legal incidence of the tax away from the tribal retailers. Thus, we treat AUTO's assertion that the legal incidence of the tax has moved off of the tribal reservation as not proved and leave for another day whether a refund must be based on taxes paid when not owed.

Second, AUTO argues that the disbursements to the tribes are not refunds because they do not provide a sufficient targeted and substantial benefit to the taxpayers who paid the tax. This seems to be predicated on the belief that the refund must benefit the class of taxpayers who paid the tax, rather than the taxpayers who bought the tax burdened fuel. While this is not a proposition of law that has been squarely examined in our case law, we conclude our case law does not support it. Under the tax schema in place at the time of both

17

*WOHVA* and *Northwest Motorcycle*, the taxes would have (or, at least, should have) been paid up the distribution chain and passed on to users who may or may not have owed it. Former RCW 82.36.035 (2005); former RCW 82.36.020 (1983). The courts did not consider whether the refunds benefited the class of those higher up the distribution chain who were legally obligated to pay the tax; the court considered whether the refunds benefited the class of those who purchased tax burdened fuel. *WOHVA*, 176 Wn.2d at 228-29; *Nw. Motorcycle*, 127 Wn. App. at 414-15. Analogously, here, the refunds were given to the tribes who successfully argued in federal court albeit under an earlier version of our taxing schema that they did not owe the tax and yet purchased tax burdened fuel. Tribal Fuel Tax Agreement Report, *supra*, at 2; *Squaxin Island Tribe*, 400 F. Supp. 2d at 1262. The refunds were paid to tribal governments under contracts that limited their use to various government purposes. That is sufficient targeting. We find the refunds to the tribes sufficiently benefit the affected taxpayers.

The State also provides little controlling helpful authority on the nature of refunds, but it has the benefit of the legislature's plenary authority to legislate, the presumption of constitutionality, and the plain language of the constitution that allows "[r]efunds authorized by law for taxes paid on motor vehicle fuels," WASH. CONST. art. II, § 40(d). AUTO has not established that the refunds to the tribes under agreements executed pursuant to RCW

82.36.450(1) and related statutes are not refunds for the purposes of article II, section 40. We find that the disbursements to the tribes under RCW 82.36.450 are refunds as contemplated by article II, section 40(d).

### B. STATUTORY AUTHORIZATION

AUTO also argues that the disbursements to the tribes are not refunds because they are not authorized by law. As AUTO properly acknowledges, the term "authorized by law" has not been defined in the context of article II, section 40. First, AUTO argues that the State has conceded that there was no statutory authorization for the refunds. Br. of Appellant at 36-37 (quoting CP at 1431-32) (deposition of Karla Laughlin). We do not find a concession in Laughlin's deposition. Laughlin agreed with AUTO's counsel that the 2007 statutes did not specifically mention refunds. But she succinctly explained that "[t]he statutes authorize the agreements; the agreements authorize the refunds." CP at 1431-32. We decline to treat this deposition testimony as a binding concession by the State that there is no statutory authorization for the refunds.

Next, AUTO argues that the needed "authority of law" is missing because RCW 82.36.450 and RCW 82.38.310 do not specifically direct the State to pay refunds to the tribes. The State argues that RCW 82.36.450 and RCW 82.38.310, which authorize the governor to enter into these agreements with tribes, and RCW 82.36.330 and RCW 46.68.090(1), which authorize the state treasurer to make disbursements from the treasury to pay refunds, provide

19

the needed authority of law. We agree with the State. Read as a whole, it is plain that the legislature that passed Laws of 2007, chapter 515 meant to authorize the governor to negotiate with the tribes tax compacts that would contain refunds. The act amended laws that authorized agreements with terms similar to those in the Colville settlement—which required refunds—with laws that authorized the governor to negotiate agreements that "may provide mutually agreeable means to address any tribal immunities or any preemption of the state motor vehicle fuel tax." LAWS OF 2007, ch. 515, §§ 19(1), 31(1). It preserved existing agreements and consent decrees, all of which that have been provided in this record include tax refunds. *Id.* §§ 19(2), 31(2). It included some specific provisions that must be present in every agreement, including a requirement that the tribes purchase tax burdened fuel. *Id.* §§ 19(3), 31(3). Plainly, the legislature contemplated that the governor would have something to offer the tribes in return for their agreement to purchase tax burdened fuel and to accept the limitations on their use of refunds.[7]

---

[7] AUTO also contends, for the first time on appeal, that the refunds are not "authorized by law" under article II, section 40 because the legislature did not make a specific appropriation under article VIII, section 4 of our state constitution. This issue was not briefed or argued below and may reach many stakeholders who have not had a meaningful opportunity to comment. For these reasons, we decline to reach it today. *Cf. Lummi Indian Nation v. State*, 170 Wn.2d 247, 256 n.1, 241 P.3d 1220 (2010) (quoting *State v. Waste Mgmt. of Wis., Inc.*, 81 Wis.2d 555, 564, 261 N.W.2d 147 (1978)). Similarly, given that the tribes are not parties to this case and given AUTO's concession that if the refunds are proper, article II, section 40 places no limitations on the tribes' use of the disbursements, we decline to consider whether the tribes are using the refunds properly under their contracts. *See* CP at 400.

We hold that the refunds to the tribes under the agreements and RCW 82.36.450, RCW 82.38.310, RCW 82.36.330 and RCW 46.68.090(1) are "refunds authorized by law" under article II, section 40(d).

## 2. UNCONSTITUTIONAL DELEGATION

Next, AUTO contends the legislature improperly delegated legislative authority to the executive to enter into fuel tax agreements with the tribes. "The Legislature is prohibited from delegating its purely legislative functions" to other branches of government. *Diversified Inv. P'ship v. Dep't of Soc. & Health Servs.*, 113 Wn.2d 19, 24, 775 P.2d 947 (1989) (citing *Hi-Starr, Inc. v. Liquor Control Bd.*, 106 Wn.2d 455, 458, 722 P.2d 808 (1986)). Separation of powers is violated when "'the activity of one branch threatens the independence or integrity or invades the prerogatives of another.'" *Hale v. Wellpinit School Dist. No. 49*, 165 Wn.2d 494, 507, 198 P.3d 1021 (2009) (internal quotation marks omitted) (quoting *Carrick v. Locke*, 125 Wn.2d 129, 135, 882 P.2d 173 (1994)).

However, the legislature may authorize the executive to take actions, and a delegation of legislative power is constitutional

> when it can be shown (1) that the legislature has provided standards or guidelines which define in general terms what is to be done and the instrumentality or administrative body which is to accomplish it; and (2) that *procedural safeguards exist to control arbitrary administrative action and any administrative abuse of discretionary power.*

21

*Barry & Barry, Inc. v. Dep't of Motor Vehicles*, 81 Wn.2d 155, 159, 500 P.2d 540 (1972). AUTO contends that neither requirement has been met here.

The legislature has provided fairly detailed standards and guidelines. The statutes grant the governor the authority to negotiate agreements with the tribes. RCW 82.36.450(1); RCW 82.38.310(1). They grant the governor the authority to delegate that authority to the department of licensing. RCW 82.36.450(5); RCW 82.38.310(5). They allow the tribe and the governor to agree to a dispute resolution mechanism to resolve questions of tribal immunity or preemption. RCW 82.36.450(1); RCW 82.38.310(1). They require the tribes to purchase previously taxed fuel. RCW 82.36.450(3); RCW 82.38.310(3). They limit the use of the refunds to "[p]lanning, construction, and maintenance of roads, bridges, and boat ramps; transit services and facilities; transportation planning; police services; and other highway-related purposes." RCW 82.36.450(3)(b); RCW 82.38.310(3)(b). They require provisions for audits to ensure compliance. RCW 82.36.450(3)(c); RCW 82.38.310(3)(c).

AUTO complains that the legislature has provided insufficient guidance, though, because the statutes grant the governor permission to enter into these agreements and grant the governor and tribes permission to agree to a dispute resolution mechanism. But it points to no case where the fact that the operation of the statute turns on what individuals "may" do rendered the statute

22

unconstitutional. This court has rejected separation of powers challenges to legislation the effectiveness of which depended on negotiation with third parties who may have chosen not to negotiate or execute contracts. *See, e.g., Brower v. State*, 137 Wn.2d 44, 55, 969 P.2d 42 (1998) ("[T]he Legislature may condition the effectiveness of legislation on the acts of a private party who may possibly benefit from the legislation."); *Diversified Inv. P'ship*, 113 Wn.2d at 25 (concerning the sale of nursing homes).

AUTO also complains that the statutes fail the first requirement because they do not define the objective of the agreements or explicitly state that the tribes are entitled to payment. Br. of Appellant at 46. A fair reading of the statutes, though, shows that they are aimed at coming to agreements to avoid conflicts over tribal immunity and the State's desire to collect fuel taxes. RCW 82.36.450(1); RCW 82.38.310(1). It is hard to imagine that would not involve payment.

AUTO also argues that the statutes fail the second requirement—"that procedural safeguards exist to control arbitrary administrative action and any administrative abuse of discretionary power." *Barry & Barry*, 81 Wn.2d at 159 (emphasis omitted). The statutes require regular audits and reports to the legislature, RCW 82.36.450(3)(c), (6); RCW 82.38.310(3)(c), (6), which AUTO deems inadequate. It is certainly correct that RCW 82.36.450 and RCW 82.38.310 themselves do not contain strong procedural safeguards against the

legislature, governor, and the tribes failing to police the agreements. But separation of powers does not require the safeguards be found in the same statute under challenge—just that the safeguards exist. *Barry & Barry*, 81 Wn.2d at 158-59. We have found sufficient safeguards exist because of administrative review and the availability of writs of certiorari, among other things. *See, e.g., id.*; *City of Auburn v. King County*, 114 Wn.2d 447, 452-53, 788 P.2d 534 (1990); *McDonald v. Hogness*, 92 Wn.2d 431, 445-47, 598 P.2d 707 (1979). No obvious route for administrative review appears here, but should the executive and legislature both fail to police against administrative abuse of power, third parties would not be completely without a remedy. They could, for example, as AUTO did below, challenge the agreements on the grounds the legislature is giving a privilege to the tribes that is not enjoyed by others similarly situated in violation of the privileges and immunities clause (article I, section 12 of the state constitution), which, frankly, seems to be AUTO's real complaint—the abiding suspicion that the tribes got a privilege that they should not have.

We hold that AUTO has not met its burden of showing that the legislature violated separation of powers by authorizing the governor to negotiate agreements with the tribes.[8]

---

[8] AUTO's request for costs on appeal is denied. The State's Motion to Strike AUTO's Second Statement of Additional Authorities as being beyond the permissible bounds of RAP 10.8 is also denied.

CONCLUSION

AUTO bears the burden of showing that the disbursements to the tribes are not "[r]efunds authorized by law for taxes paid on motor vehicle fuels" under article II, section 40(d). We find that it has not met that burden. We also find no unconstitutional delegation of legislative power. The judgment of the trial court is affirmed.

_Gonzáles, J._

WE CONCUR:

_Madsen, C.J._

_Johnson, J._

_Owens, J._

_Fairhurst, J._

_Stephens, J._

_Wiggins, J._

_González McCloud, J._

_Yu, J_