**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE  MAR 1 6 2017

Fairhurst, C.
CHIEF JUSTICE

This opinion was filed for record

at  8:00 am  on March 16, 2017

Susan L. Carl

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

COUGAR DEN, INC., a Yakama
Nation corporation,

     Respondent,

  v.

WASHINGTON STATE
DEPARTMENT OF LICENSING,

     Appellant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 92289-6

En Banc

Filed    MAR 1 6 2017

  JOHNSON, J.—Article III of the Yakama Nation Treaty of 1855 provides in pertinent part:

> [I]f necessary for the public convenience, roads may be run through the said reservation; and on the other hand, the right of way, with free access from the same to the nearest public highway, is secured to them; as also the right, in common with citizens of the United States, to travel upon all public highways.

Treaty with the Yakamas, 12 Stat. 951, 952-53 (1855).

  The issue in this case centers on the interpretation of the "right to travel" provision in the treaty, in the context of importing fuel into Washington State. The Washington State Department of Licensing (Department) challenges Cougar Den Inc.'s importation of fuel without holding an importer's license and without paying

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

state fuel taxes under former chapter 82.36 RCW, *repealed by* LAWS OF 2013, ch. 225, § 501, and former chapter 82.38 RCW (2007).

An administrative law judge (ALJ) ruled in favor of Cougar Den, holding that the right to travel on highways should be interpreted to preempt the tax. The Department's director, Pat Kohler, reversed. On appeal, the Yakima County Superior Court reversed the director's order and ruled in favor of Cougar Den. We affirm.

FACTS AND PROCEDURAL HISTORY

Cougar Den is a Confederated Tribes and Bands of the Yakama Nation (Yakama Nation) corporation that transports fuel from Oregon to the Yakama Indian Reservation, where it is sold. Kip Ramsey, Cougar Den's owner and president, is an enrolled member of the Yakama Nation.

Cougar Den began transporting fuel in 2013 from Oregon to the Yakama Indian Reservation. Cougar Den contracted with KAG West, a trucking company, to transport the fuel into Washington from March 2013 to October 2013.

On December 9, 2013, the Department issued assessment number 756M against Cougar Den, demanding $3.6 million in unpaid taxes, penalties, and licensing fees for hauling the fuel across state lines. Cougar Den appealed the assessment to the Department's ALJ, who held in his initial order that the assessment was an impermissible restriction under the treaty. The Department sought review of the

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Cougar Den, Inc. v. Dep't of Licensing*, No. 92289-6

ALJ's initial order. Upon review, the director of the Department reversed the ALJ and entered findings of fact and conclusions of law.

The director held that the Yakama treaty did not preempt the taxes, license requirements, and penalties sought against Cougar Den. Cougar Den then petitioned for review of the final order by the Department. The Yakima County Superior Court, sitting in an appellate capacity, reversed the director's order and held that the taxation violated the tribe's right to travel. The Department appealed the superior court's decision and sought direct review under RAP 4.2(a)(2). We granted direct review.

ANALYSIS

This case began as a challenge to an administrative order; therefore, review is governed by chapter 34.05 RCW. Under that statute, in relevant part, we review to determine whether the decision is an erroneous interpretation or application of the law.[1] Generally, an "'agency decision is presumed correct and the challenger bears the burden of proof.'" *King County Pub. Hosp. Dist. No. 2 v. Dep't of Health*, 178 Wn.2d 363, 372, 309 P.3d 416 (2013) (quoting *Providence Hosp. of Everett v. Dep't of Soc. & Health Servs.*, 112 Wn.2d 353, 355, 770 P.2d 1040 (1989)). However, this case involves a treaty interpretation, which is a legal question reviewed de novo. *Chi. Title*

---

[1] "Review of agency orders in adjudicative proceedings. The court shall grant relief from an agency order in an adjudicative proceeding only if it determines that:
"....
"(d) The agency has erroneously interpreted or applied the law." RCW 34.05.570(3)(d).

*Cougar Den, Inc. v. Dep't of Licensing*, No. 92289-6

*Ins. Co. v. Office of Ins. Comm'r*, 178 Wn.2d 120, 133, 309 P.3d 372 (2013) ("The agency's interpretation of pure questions of law is not accorded deference." (citing *Hunter v. Univ. of Wash.*, 101 Wn. App. 283, 292, 2 P.3d 1022 (2000))). This court sits in the same position as the superior court, reviewing the standards of the Washington Administrative Procedure Act, chapter 34.05 RCW, directly to the record established before the agency.

Washington State law imposes a tax on fuels used for the propulsion of motor vehicles on the highways of the state. In 2013, when Cougar Den transported fuel into the state, chapter 82.36 RCW governed taxes on motor vehicle fuel, or gasoline, and former chapter 82.38 RCW governed taxes on "special fuel," which includes diesel fuel.[2] Fuel taxes are imposed at the wholesale level, when fuel is removed from the terminal rack or imported into the state. Former RCW 82.36.020(2) (2007); former RCW 82.38.030(7) (2007).

The Yakama Indian Reservation is a federally recognized Indian tribal reservation located within the state of Washington. Outside an Indian reservation, Indian citizens are subject to state tax laws, "[a]bsent express federal law to the contrary." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148, 93 S. Ct. 1267, 36 L. Ed. 2d 114 (1973). A treaty constitutes an express federal law. There is no dispute that

---

[2] In 2013, Governor Jay Inslee signed House Bill 1883, which repealed chapter 82.36 RCW and combined it with chapter 82.38 RCW. H.B. 1883, 63d Leg., Reg. Sess. (Wash. 2013).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Cougar Den, Inc. v. Dep't of Licensing*, No. 92289-6

the taxes and licensing requirements would apply if the treaty provision does not

apply here. However, Cougar Den asserts that the right to travel provision in the treaty

precludes the State from demanding unpaid taxes, penalties, and licensing fees for

hauling the fuel across state lines (relying on treaty language that "the right of way . . .

is secured to them . . . to travel upon all public highways").

The United States Supreme Court has established a rule of treaty interpretation:

Indian treaties must be interpreted as the Indians would have understood them.

> The Indian Nations did not seek out the United States and agree upon an
> exchange of lands in an arm's-length transaction. Rather, treaties were
> imposed upon them and they had no choice but to consent. As a
> consequence, this Court has often held that treaties with the Indians must
> be interpreted as they would have understood them.

*Choctaw Nation v. Oklahoma*, 397 U.S. 620, 630-31, 90 S. Ct. 1328, 25 L. Ed. 2d 615

(1970).

> It is our responsibility to see that the terms of the treaty are carried out,
> so far as possible, in accordance with the meaning they were understood
> to have by the tribal representatives at the council, and in a spirit which
> generously recognizes the full obligation of this nation to protect the
> interests of a dependent people.

*Tulee v. Washington*, 315 U.S. 681, 684-85, 62 S. Ct. 862, 86 L. Ed. 1115 (1942).

The Ninth Circuit has recognized this rule of treaty construction. *See United

States v. Smiskin*, 487 F.3d 1260, 1264 (9th Cir. 2007); *Cree v. Flores*, 157 F.3d 762,

769 (9th Cir. 1998) (*Cree* II). Treaties are broadly interpreted, with doubtful or

ambiguous expressions resolved in the Indians' favor.

5

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

The Department argues that Cougar Den's reading of the right to travel provision is overly broad. It asserts that the Ninth Circuit cases involving the right to travel forbid the State from specifically restricting the right to travel on a highway, but allow the State to restrict or regulate a specific good that is incidentally brought over a highway. The Department argues that the treaty does not preempt Washington State fuel taxes in this case. Both parties here support their arguments by citing several Ninth Circuit cases.

The Department's interpretation of the treaty provision ignores the historical significance of travel to the Yakama Indians and the rule of treaty interpretation established by the United States Supreme Court. In ruling in Cougar Den's favor, both the ALJ and the Yakima County Superior Court based their decisions on the history of the right to travel provision of the treaty, relying on the findings of fact and conclusions of law from *Yakama Indian Nation v. Flores*, 955 F. Supp. 1229 (E.D. Wash. 1997).

The factual record regarding the treaty interpretation of the historical meaning of the right to travel relied on below was developed in a federal action, *Cree* II.[3]

---

[3] This *Cree* case began in the federal district court as *Cree v. Waterbury*, 873 F. Supp. 404 (E.D. Wash. 1994), appealed to the Ninth Circuit, then remanded for factual development in *Yakama Indian Nation. Cree v. Waterbury (Cree* I), 78 F.3d 1400 (9th Cir. 1996). In *Yakama Indian Nation*, the court undertook "a 'factual investigation into the historical context and parties' intent at the time the Treaty was signed [in order to] determine the precise scope of the highway right,'" and "'examine[d] the Treaty language as a whole, the circumstances surrounding the Treaty, and the conduct of the parties since the Treaty was signed in order to

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Because the rule of treaty interpretation requires that treaties be read as the Indians would have understood them, the district court conducted an extensive factual inquiry regarding the treaty and the historical context of the right to travel provision. The court determined that the treaty and the right to travel provision in particular was of tremendous importance to the Yakama Nation at the time the treaty was signed. Travel was woven into the fabric of Yakama life in that it was necessary for hunting, gathering, fishing, grazing, recreational, political, and kinship purposes. Importantly, at the time, the Yakamas exercised free and open access to transport goods as a central part of a trading network running from the western coastal tribes to the eastern plains tribes. The court found that the record unquestionably depicted a tribal culture whose manner of existence was dependent on the Yakamas' ability to travel. *Yakama Indian Nation*, 955 F. Supp. at 1239.

At the time the treaty was drafted, agents of the United States knew of the Yakamas' reliance on travel. During negotiations, the Yakamas' right to travel off reservation had been repeatedly broached, and assurances were made that entering into the treaty would not infringe on or hinder their tribal practices. Promises were made to protect the Indians from "'bad white men'" if the tribes agreed to live within

---

interpret the scope of the highway right.'" *Yakama Indian Nation*, 955 F. Supp. at 1234, 1235 (quoting *Cree* I, 78 F.3d at 1403, 1405). After completing extensive investigation, it entered findings of fact and conclusions of law.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

designated reservations. *Yakama Indian Nation*, 955 F. Supp. at 1243. Agents of the United States thus repeatedly emphasized in negotiations that tribal members would retain the "'same liberties . . . *to go on the roads to market.*'" *Yakama Indian Nation*, 955 F. Supp. at 1244. The court further determined that "both parties to the treaty expressly intended that the Yakamas would retain their right to travel outside reservation boundaries, with no conditions attached." *Yakama Indian Nation*, 955 F. Supp. at 1251. The treaty was presented as a means to preserve Yakama customs and protect against further encroachment by white settlers. There was no mention of any sort of restriction on hunting, fishing, or travel other than the condition that the government be permitted to construct wagon roads and a railroad through the reservation. Finally, the court found that "the Treaty was clearly intended to reserve to the Yakamas' right to travel on the public highways to engage in *future* trading endeavors." *Yakama Indian Nation*, 955 F. Supp. at 1253.

In reliance on these vital promises, the Yakamas forever ceded 90 percent of their land in exchange for these rights. Yakama Nation thus understandably assigned a special significance to each part of the treaty at the time of the signing and continues to view the treaty as a sacred document today. It is important to note that although the United States negotiated with many Northwest tribes, only the treaties with the Yakamas and Nez Perce contained highway clauses like this one. *Cree* II, 157 F.3d at 772.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Cougar Den, Inc. v. Dep't of Licensing*, No. 92289-6

With the historical importance of the right to travel in mind, on review, the Ninth Circuit adopted the findings and treaty interpretation from the district court and held that the treaty exempted the Yakama Indians from various Washington truck license and overweight permit fees. In that case, the plaintiff, Yakama Indian Nation, sold timber and hauled logs from within reservation lands to off-reservation mills. Defendants were state officers authorized to issue traffic citations for violations of state vehicle registration, licensing, and permitting statutes. Plaintiff brought suit after the officers issued citations for violation of these statutes. In determining whether the treaty exempted Yakama Indian Nation from the fees, the court considered the historical context of the treaty and recognized the significance of travel to the Yakamas. The court agreed with the district court's finding that the treaty secured for the Yakamas' the right to use future roads and to *trade* their goods. The court held that the treaty exempted the tribe from truck license and permitting fees. *Cree II*, 157 F.3d at 774.

Nine years later, the Ninth Circuit considered the right to travel in another context in *Smiskin*. In that case, agents of the federal Bureau of Alcohol, Tobacco, Firearms and Explosives suspected the Smiskins, members of Yakama Nation, of transporting unstamped cigarettes from smoke shops on an Idaho Indian reservation to smoke shops on various Indian reservations in Washington. In June 2004, the agents seized 4,205 cartons of unstamped cigarettes from the Smiskins' residence and

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

charged them with violating the federal contraband cigarette trafficking act (CCTA), 18 U.S.C. § 2342(a). Under the CCTA, it is "unlawful for any person knowingly to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes." 18 U.S.C. § 2342(a). "'[C]ontraband cigarettes' means a quantity in excess of 10,000 cigarettes, which bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found." 18 U.S.C. § 2341(2).

Washington State requires wholesalers to affix either a "tax paid" or "tax exempt" stamp to cigarette packaging prior to sale. *See* RCW 82.24.030. Individuals other than licensed wholesalers may transport unstamped cigarettes only if they have "given notice to the [Washington State Liquor Control Board] in advance of the commencement of transportation." RCW 82.24.250(1). The Smiskins did not provide notice to the State prior to transporting unstamped cigarettes; therefore, the cigarettes were unauthorized under state law. As a result, the Smiskins' possession and transportation of the contraband cigarettes was alleged to violate the terms of the CCTA.

Again, to determine whether the treaty precluded the State from prosecuting the Smiskins' violation of the State's prenotification requirement, the Ninth Circuit looked to the right to travel provision of the treaty. The court held that the Smiskins were not required to notify anyone prior to transporting goods to market because the

10

*Cougar Den, Inc. v. Dep't of Licensing*, No. 92289-6

treaty "'expressly intended that the Yakamas would retain their right to travel outside reservation boundaries, *with no conditions attached*.'" *Smiskin*, 487 F.3d at 1266 (quoting *Yakama Indian Nation*, 955 F. Supp. at 1251). It held that applying a prenotification requirement was a condition on travel that violated the Yakamas' treaty right to transport goods to market without restriction.

The court noted the "tremendous importance" of the right to travel provision and "refuse[d] to draw what would amount to an arbitrary line between travel and trade." *Smiskin*, 487 F.3d at 1265-66. "[W]hether the goods at issue are timber or tobacco products, the right to travel overlaps with the right to trade under the Yakama Treaty such that excluding commercial exchanges from its purview would effectively abrogate our decision in *Cree* II and render the Right to Travel provision truly impotent." *Smiskin*, 487 F.3d at 1266-67 (footnote omitted).

Of importance in the decision is the court's discussion of the regulatory exception. In resolving conflicts between state laws and Indian treaties, the United States Supreme Court has stated that pure regulatory restrictions may be validly applied to tribal members. The State in *Smiskin* argued that the State's tax collection effects had a regulatory purpose. However, the court found that Washington's stated purpose for requiring cigarette stamps, and hence for requiring notice before unstamped cigarettes are transported within the State, was to "'enforce collection of

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

the tax hereby levied.'" *Smiskin*, 487 F.3d at 1269 (quoting RCW 82.24.030(1)). The court rejected the State's arguments and held that the treaty protected the activity.

More recently, in 2014, the Ninth Circuit addressed the right to travel provision again. The Department relies on *King Mountain Tobacco Co. v. McKenna*, 768 F.3d 989 (9th Cir. 2014), to assert that the trial court interpreted the right to travel provision too broadly. In *King Mountain*, the plaintiff was a private tobacco company owned by Delbert Wheeler, an enrolled member of the Yakama Nation. King Mountain sought relief from application of Washington's escrow statute, which required King Mountain to place money into escrow to reimburse the State for health care costs related to the use of tobacco products. The court analyzed the treaty again and held that the plain text reserved to the Yakamas the right "'to travel upon all public highways,'" not the "right to trade." *King Mountain*, 768 F.3d 997, 998 (quoting 12 Stat. 953). The court distinguished *King Mountain* from the *Cree* cases by noting that the *Cree* cases involved "the right to travel (driving trucks on public roads) for the purpose of transporting goods to market." *King Mountain*, 768 F.3d 998. The court affirmed judgment in favor of the State and rejected King Mountain's reliance on the treaty right to travel.

The Department argues that this case is analogous to *King Mountain* because both companies "claim[] a right to engage in *trade* in addition to or above and beyond a right to travel upon the highways." Appellant's Opening Br. at 27. The Department

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

asserts that Cougar Den is not facing a tax for "'using public highways. . . . [Rather, it] is being taxed for importing fuel.'" Appellant's Opening Br. at 27 (quoting Clerk's Papers at 1008). The Department argues that Cougar Den relies "heavily on dicta" in *Smiskin*. Appellant's Opening Br. at 29. The Department argues that in *Smiskin*, the State restricted the right to travel on the highway, whereas here, the State is regulating fuel. The Department argues, and the Director agreed, that the taxes are assessed based on incidents of ownership or possession of fuel, and not incident to use of or travel on the roads or highways. It distinguishes *Smiskin* by asserting that Cougar Den does not need a fuel importer license in order to use public highways. "Rather, Cougar Den needs a fuel importer license to engage in business as a fuel trader." Appellant's Opening Br. at 30. The "tax applies without regard to travel on a highway," and "Cougar Den happens to hire trucks," but "[t]he tax is not a condition or restriction on Cougar Den's use of highways." Appellant's Opening Br. at 30, 31. It argues that the tax is imposed at the border and is assessed regardless of whether Cougar Den uses the highway.

The Department's argument is unpersuasive. *Smiskin* is nearly identical to this case. In both cases, the State placed a condition on travel that affected the Yakamas' treaty right to transport goods to market without restriction. The difference between *Smiskin* and *King Mountain* is that in *King Mountain*, travel was not at issue. In *King Mountain*, the court held under the facts that "there is no right to trade in the Yakama

*Cougar Den, Inc. v. Dep't of Licensing*, No. 92289-6

Treaty." *King Mountain*, 768 F.3d at 998. Where trade does not involve travel on public highways, the right to travel provision in the treaty is not implicated. Here, travel on public highways is directly at issue because the tax was an importation tax. The fact that the tax is imposed at the border and is assessed regardless of whether Cougar Den uses the highway is immaterial because, in this case, it was impossible for Cougar Den to import fuel without using the highway.

In addition, the tax does not, as the State argues, fall under the regulatory exception. In *Smiskin*, the purpose of the notice requirement was the collection of taxes on the transported goods. The prenotification requirement was triggered by the transportation of cigarettes into the state. Likewise, here, the Department requires that companies obtain a license prior to hauling goods into the state: the purpose of the licensing requirement is to collect taxes. We hold that the right to travel provision in the treaty protects the Tribe's historical practice of using the roads to engage in trade and commerce.

Finally, the Department argues that applying the Ninth Circuit's reasoning would lead to "unimagined and unintended preemption of fundamental state powers." Appellant's Opening Br. at 32. The Department noted that the superior court's reasoning "could allow Yakama tribal members to avoid state laws that regulate goods by simply contriving to possess the goods on public highways." Appellant's Opening Br. at 33. An example the Department gave was that Yakama tribal members

14

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Cougar Den, Inc. v. Dep't of Licensing*, No. 92289-6

could avoid the law barring a felon from possessing a firearm simply because by traveling on a public highway, the treaty preempts state law. This same argument was made by the Defendants in *Smiskin:* if affirmed, the court's ruling would "preclude the State of Washington and the federal government from regulating tribal transportation of other 'restricted goods,' such as illegal narcotics and 'forbidden fruits [and] vegetables.'" *Smiskin*, 487 F.3d at 1270-71 (alteration in original). The Ninth Circuit rejected this argument, observing that the concern was "unfounded, if not disingenuous." *Smiskin*, 487 F.3d at 1271. Laws with a purely regulatory purpose can be validly applied. In addition, the Ninth Circuit quoted the Yakama Nation and its amicus brief:

> "The Yakama Nation is a sovereign nation, with its own government, laws and courts, not a rogue organization or menace to civil order. The Yakama Nation does not and never has asserted that its members have a right under its treaty to traffic in narcotics. For the government of the United States to be suggesting otherwise is irresponsible.

> "The Yakama Nation must and will intercede as litigant or *amicus* to protect its members' treaty right to travel when the federal government overreaches, as it has here. But the Nation has no interest in promoting, condoning, or protecting activities by its members that pose real dangers to public health, public safety, natural resources, or public infrastructure. The Nation has no such interest not only because irresponsible overreaching on its part would likely prompt Congress to exercise its constitutional/ political power to abrogate or limit the treaty right to travel, but also because the Yakama Nation and its members share the interest all citizens have in public health, public safety, conservation and equitable exploitation of natural resources, and adequate public infrastructure."

15

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Smiskin,* 487 F.3d at 1271. We agree.

We also note that this case does not present the "parade of horribles" concern raised by the State. In interpreting the treaty, we are bound to read the provisions as the Tribe understood them. As noted, the right to travel provision appears to be unique to the Yakama and Nez Perce tribes. If the State has concerns about this treaty provision, only Congress can revise or restrict the provisions, not this court.

As determined by the federal courts, any trade, traveling, and importation that requires the use of public roads fall within the scope of the right to travel provision of the treaty. The Department taxes the importation of fuel, which is the transportation of fuel. Here, it was simply not possible for Cougar Den to import fuel without traveling or transporting that fuel on public highways. Based on the historical interpretation of the Tribe's essential need to travel extensively for trade purposes, this right is protected by the treaty.[4]

---

[4] Cougar Den also asserts that the director of the Department violated the appearance of unfairness doctrine. The Department counters by arguing that Cougar Den failed to raise the issue; therefore, the appellate court cannot entertain disqualification claims. This claim does not need to be addressed because the merits of the claim are reviewed de novo by this court. And, under either result here, the director will have no future role.

*Cougar Den, Inc. v. Dep't of Licensing*, No. 92289-6

We affirm.

WE CONCUR:

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Cougar Den, Inc. v. Dep't of Licensing*, No. 92289-6
Fairhurst, C.J. (dissenting)

No. 92289-6

FAIRHURST, C.J. (dissenting)—Washington's fuel excise tax burdens trade—the first instance of *wholesale possession* of fuel within Washington—not fuel transport. The Confederated Tribes and Bands of the Yakama Nation's (Yakama Nation) "right . . . to travel," as described in article III of their treaty, *Treaty with the Yakamas*, 12 Stat. 951, 953 (1855) (treaty right to travel), is not a right to trade. The majority's holding, if taken to its logical conclusion, would create a hole, bigger than that required to drive a tanker truck, in Washington's ability to tax goods consumed within the state, without legal basis. Therefore, I respectfully dissent.

## I. ANALYSIS

"Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law." *Mescalero Apache Tribes v. Jones*, 411 U.S. 145, 148-49, 93 S. Ct. 1267, 36 L. Ed. 2d 1114 (1973). This includes state fuel excise taxes. *Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 97, 126 S. Ct. 676, 163 L. Ed. 2d 429 (2005) The

1

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Cougar Den, Inc. v. Dep't of Licensing*, No. 92289-6
Fairhurst, C.J. (dissenting)

majority holds that the treaty right to travel preempts Washington's motor vehicle fuel excise tax, former chapter 82.36 RCW (2007), *repealed by* LAWS OF 2013, ch. 225, § 501, and special fuel excise tax, former chapter 82.38 RCW (2007), *amended by* LAWS OF 2013, ch. 225, § 501.[1] As a result, it finds Cougar Den Inc.'s off-reservation fuel importation activities exempt from Washington's fuel excise tax regime. I disagree and, therefore, respectfully dissent.

A.    Former chapters 82.36 and 82.38 RCW represent a tax on the *wholesale possession*, not transportation, of fuel

The majority reaches its holding after finding that Washington's fuel excise tax regime "taxes the importation of fuel, which is the transportation of fuel." Majority at 16. But "import," as used here, is a term of art not requiring transportation of any kind. Former RCW 82.36.010(10); former RCW 82.38.020(12). "Import" is defined as "bring[ing] . . . fuel into this state," other than through a "pipeline or vessel" operated by a "licensee" and bound for a "terminal" or "refinery," unless located in "the fuel supply tank of a motor vehicle." Former RCW 82.36.010(3), (4), (10), .020(2)(c); former RCW 82.38.020(4), (5), (12),

---

[1] The distinction between motor vehicle fuel and special fuel, which includes diesel fuel, was removed effective July 1, 2015. The statute was simplified and recodified into chapter 82.38 RCW. LAWS OF 2013, ch. 225, § 501. Previously, taxes were separately imposed on motor vehicle fuel, special fuel, and aviation fuel pursuant to separate RCW chapters. S.B. REP. ON SUBSTITUTE H.B. 1883, at 2, 63d Leg., Reg. Sess. (Wash. 2013). All references to chapters 82.36 and 82.38 RCW in this opinion are to the RCW in effect at the time of the Department of Licensing's tax assessments against Cougar Den—2013.

2

*Cougar Den, Inc. v. Dep't of Licensing*, No. 92289-6
Fairhurst, C.J. (dissenting)

.030(7)(c). Further, the tax is levied "at the time and place of the first taxable event and upon the first taxable person within this state." Former RCW 82.36.022; former RCW 82.38.031. The statutory language alone demonstrates the clear intent of the legislature—to levy an excise tax on the first instance of *wholesale possession* of fuel not distributed through a refinery or importation terminal within the state. Whether that fuel is then brought to market within Washington is not necessary or relevant for purposes of assessing tax due. The history of Washington's fuel tax regime only further reinforces this conclusion.

Washington first levied an excise tax on motor vehicle fuel in 1921. *Auto. United Trades Org. v. State*, 183 Wn.2d 842, 845, 357 P.3d 615 (2015) (citing LAWS OF 1921, ch. 173, § 2). Until 1999, retailers were primarily responsible for paying the tax. *Id.* at 847. To improve compliance and reduce administrative costs, Washington shifted the reporting and collection burden to the suppliers at the top of the fuel supply chain in 1999. S.B. REP. ON SUBSTITUTE H.B. 2659, at 1-2, 55th Leg., Reg. Sess. (Wash. 1998).[2]

Refiners and terminal operators were now charged with collecting, reporting, and remitting excise tax when fuel was removed "from a terminal . . . at the rack,"

---

[2] At the time, there were 740 licensed fuel distributors and 27,000 individuals licensed to purchase fuel without paying tax at the time of purchase. S.B. REP. ON SUBSTITUTE H.B. 2659, at 1.

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

LAWS OF 1998, ch. 176, § 7(2)(a) (formatting omitted), or "from a refinery" by "bulk transfer" or "refinery rack," *id.* § 7(2)(b)(i), (ii) (formatting omitted). "'Rack'" is defined as a "mechanism for delivering . . . fuel from a refinery or terminal."[3] *Id.* §§ 6(23), 50(20) (formatting omitted). But distributors, and ultimately retailers, remained burdened with paying the tax. *Squaxin Island Tribe v. Stephens*, 400 F. Supp. 2d 1250, 1261 (W.D. Wash. 2005). They were required to reimburse refiners and terminal operators for tax those suppliers prepaid on their behalf.[4] LAWS OF 1998, ch. 176, § 12(5). Fuel transport within Washington was not mentioned in the revised scheme, except for certain basic reporting obligations and routine inspections for those transporting fuel. *See id.* §§ 32, 33, 66, 80. For refined fuel bypassing the rack system via direct importation, the fuel importer would be liable for the tax on any fuel that it imports for purposes of "sale, consumption, use, or storage." *Id.* §§ 6(11), 7(2)(c), 50(12), 51(2)(c) (formatting omitted). Cougar Den's tax assessments arose under a version of this provision, as revised in 2007.

In 2007, the legislature revised the statute to address the opportunity *Squaxin Island Tribe*, 400 F. Supp. 2d at 1250, gave tribal retailers operating on Indian lands

---

[3] There were 24 terminal racks within Washington when the statute was last modified in 2013. S.B. REP. ON SUBSTITUTE H.B. 1883, at 1, 63d Leg., Reg. Sess. (Wash. 2013).

[4] Further, refiners and terminal operators were entitled to refunds from the State for any prepaid tax they could not collect on fuel sold to distributors and retailers. LAWS OF 1998, ch. 176, § 15.

4

*Cougar Den, Inc. v. Dep't of Licensing*, No. 92289-6
Fairhurst, C.J. (dissenting)

to avoid the imposition of Washington's fuel excise tax for their fuel sales to both tribal and nontribal members.[5] S.B. REP. ON S.B. 5272, at 1-2, 60th Leg., Reg. Sess. (Wash. 2007). Under the revised 2007 regime, those at the top of the supply chain—refiners and terminal operators—would now be solely responsible for the payment of tax when fuel is removed from their rack.[6] *Id.*; LAWS OF 2007, ch. 515, §§ 2, 6, 9, 18, 21. They would no longer prepay tax on behalf of the distributors and retailers they sold to. *Id.* §§ 4, 23.[7] Should there be any question, the legislature also added the following language: "It is the intent and purpose . . . that the tax shall be imposed *at the time and place of the first taxable event* and upon the first taxable person within this state." *Id.* at §§ 20, 33 (emphasis added); former RCW 82.36.022; former

---

[5] The court held that despite suppliers' collection and reporting obligations under the 1999 statute, the legal incidence of the fuel excise tax regime continued to fall on retailers, rather than suppliers, distributors, or consumers. *Squaxin Island Tribe*, 400 F. Supp. 2d at 1261. To the extent those retailers were tribes or tribal members operating on Indian lands, they were exempt from Washington's fuel excise tax. *Id.* In *Squaxin*, the court applied *Oklahoma Tax Commission v. Chickasaw Nation*, 515 U.S. 450, 458-59, 115 S. Ct. 2214, 132 L. Ed. 2d 400 (1995), which established a legal incidence test, to determine whether Washington's fuel tax regime ran afoul of tribal sovereignty. *Id.* Under this test, who ultimately pays the tax does not control. "Although consumers in Washington State will nearly always find the tax imbedded in the price of fuel, the Supreme Court explicitly cautioned against using 'economic reality' as a basis for answering the legal incidence question." *Id.* (citing *Chickasaw*, 515 U.S. at 459-60). Instead, the language of the statute controls. *Id.* If this language places the legal incidence of the state tax on a sovereign party, that tax cannot be levied. *Id.*

[6] In response, some tribes threatened to establish their own refineries or terminals on Indian land in order to avoid the imposition of tax based on sovereign authority. *Auto. United Trades*, 183 Wn.2d at 848. Instead, most—excluding the Yakama Nation—entered into tax sharing arrangements in which the tribe receives a refund of tax paid by suppliers on fuel purchased by tribal members on their reservations. *Id.* at 850-51.

[7] Further, the suppliers' statutory mechanism to recover prepaid tax was removed. LAWS OF 2007, ch. 515, §§ 4, 23.

*Cougar Den, Inc. v. Dep't of Licensing*, No. 92289-6
Fairhurst, C.J. (dissenting)

RCW 82.38.031. These changes reinforce the notion that possession, not distribution, is the intended activity subject to tax.

The legislature made another change in 2007 that reinforces this notion. From 1999 through 2007, tax applied to imported motor vehicle fuel only when that fuel was imported for purposes of "sale, consumption, use, or storage" within Washington. LAWS OF 1998, ch. 176, § 7(2)(c) (formatting omitted). Beginning in 2007, *all* imported motor vehicle fuel would be subject to tax, regardless of the purpose for which it was imported.[8] LAWS OF 2007, ch. 515, § 2(2)(c); former RCW 82.36.020(2)(c). This language was operative at the time of the Department of Licensing's (DOL) assessments against Cougar Den. *See* Clerk's Papers (CP) at 66-68, 81-82 (December 2013 and February 2014 DOL tax assessments against Cougar Den).

This history further demonstrates the legislature's intent—to impose tax at the highest level possible in the supply chain. For importation activities, this would be

---

[8] A similar "sale, consumption, use, or storage" condition was included in Washington's special fuel excise tax statute prior to the 2007 change. LAWS OF 1998, ch. 176, § 51(2)(c) (formatting omitted). In what may have been a scrivener's error, the language was retained for special fuel while removed for motor vehicle fuel. LAWS OF 2007, ch. 515, § 21(7)(c); former RCW 82.38.030(7)(c). When the statutes were later consolidated into chapter 82.38 RCW, effective July 1, 2015, this conditional language remained. LAWS OF 2013, ch. 225, § 103(7)(c). It is not clear whether keeping this conditional language was intended, as it had previously been removed in 2007 for imported motor vehicle fuel.

6

*Cougar Den, Inc. v. Dep't of Licensing*, No. 92289-6
Fairhurst, C.J. (dissenting)

the first instance of *wholesale possession* of fuel within Washington. I fail to see how such a scheme directly implicates travel.

B.  The Yakama Nation's treaty right to travel applies to trade *only* when it cannot be meaningfully separated from travel, not when travel is merely necessary for trade

Both *Smiskin* and *King Mountain* provide that a treaty right to travel applies to trade *only* when Washington law imposes a limitation on travel and trade, *and* the two cannot be meaningfully separated. *United States v. Smiskin*, 487 F.3d 1260, 1266 (9th Cir. 2007); *King Mountain Tobacco Co. v. McKenna*, 768 F.3d 989, 997-98 (9th Cir. 2014). Such is not the case with Washington's fuel excise tax. The majority fails to see this distinction and, instead, concludes that Cougar Den's trading activity is exempt from Washington's fuel excise tax merely because travel is necessary for trade. But neither *Smiskin* nor *King Mountain* held this to be a relevant consideration.

At issue in *Smiskin* was the application of the contraband cigarette trafficking act (CCTA), 18 U.S.C. § 2342(a), to a Yakama Nation member. 487 F.3d at 1263. The CCTA imposes criminal penalties for dealing in contraband cigarettes. *Id.* "Contraband cigarettes," in turn, are defined by state law. Washington law provides that cigarettes not containing tax stamps that are transported by wholesalers who fail to first notify Washington's Liquor Control Board of their intent to transport are

7

*Cougar Den, Inc. v. Dep't of Licensing*, No. 92289-6
Fairhurst, C.J. (dissenting)

contraband. *Id.*; RCW 82.24.250(1). Transport, *not possession*, was the predicate for the prosecution at issue in *Smiskin*.[9]

In ruling for Smiskin, the United States Court of Appeals for the Ninth Circuit held that his treaty right to travel preempted Washington's transportation notice requirement because the right includes the right to "'transport goods to *market*' for '*trade* and other purposes'" and the notice requirement burdened such transport. *Smiskin*, 487 F.3d at 1266 (quoting *Cree v. Flores*, 157 F.3d 762, 769 (9th Cir. 1998)). The court noted that when "the right to travel overlaps with the right to trade . . . such that excluding commercial exchanges . . . would effectively abrogate our [prior decisions] and render the Right to Travel provision truly impotent," it should not "draw what would amount to an arbitrary line between travel and trade." *Id.* at 1266-67. But *Smiskin* does not stand for the proposition the majority asserts—the Yakama Nation's treaty right to travel is a de facto right to trade simply because travel is necessary for trade. Indeed, a reading of *King Mountain* confirms the opposite to be true. 768 F.3d at 989. Travel was necessary for the trade at issue in *King Mountain*, yet the Ninth Circuit found the state obligation burdened only trade,

---

[9] In *United States v. Fiander*, another Yakama Nation member successfully defended a CCTA charge based on his treaty right to travel. 547 F.3d 1036 (9th Cir. 2008). While the CCTA defense was upheld, the court held the defendant could still be prosecuted for conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d), for his activities. *Id.* at 1039-42.

8

*Cougar Den, Inc. v. Dep't of Licensing*, No. 92289-6
Fairhurst, C.J. (dissenting)

rather than travel and, therefore, was not preempted by the Yakama Nation's treaty right to travel. *Id.* at 997-98. *Smiskin* simply stands for the proposition that when travel and trade cannot be meaningfully separated within a state scheme, a Yakama Nation member's treaty right to travel preempts both aspects of that scheme.

The state obligation in *King Mountain* arose from a Washington statute requiring tobacco product manufacturers to place into escrow funds to reimburse Washington for health care costs associated with the tobacco products they sold to Washington consumers. *Id.* at 991-92; RCW 70.157.020. King Mountain asserted that the Yakama Nation's treaty right to travel "'unequivocally prohibit[s] imposition of economic restrictions . . . on the Yakama people's Treaty right to . . . trade,'" which includes bringing goods to market. *King Mountain*, 768 F.3d at 997. But the Ninth Circuit held otherwise, limiting the scope of the treaty right to travel to "'guarantee[ing] the Yakamas the right to transport goods to market over public highways without payment of fees for that use.'" *Id.* (quoting *Cree*, 157 F.3d at 769). It is not a "right to trade." *Id.*

Cougar Den and amicus make similar arguments as King Mountain attempted to make—the treaty applies equally to trade and travel. Resp't's Br. at 24-26; Amicus Curiae Br. of Yakama Nation at 12-13; *see King Mountain*, 768 F.3d at 992 (King Mountain asserts treaty right applies to "state economic regulation"). But this is not

9

*Cougar Den, Inc. v. Dep't of Licensing*, No. 92289-6
Fairhurst, C.J. (dissenting)

so. The treaty right applies to trade only if inextricably linked to travel. Otherwise, the argument fails. *Smiskin*, 487 F.3d at 1266. As a result, it should fail here, as it failed in *King Mountain*, 768 F.3d at 997-98.

The escrow payment in *King Mountain* had nothing to do with travel, other than to impose a financial burden on the products King Mountain sought to bring to market in Washington.[10] *Id.* at 991; *see* RCW 70.157.020 (requiring an escrow payment by tobacco manufacturers for products sold to "consumers within the State"). Similarly, Washington's fuel excise tax on importers, imposed on the first incidence of wholesale possession of fuel within Washington, has nothing to do with travel, other than to impose a financial burden on the products fuel importers seek to bring to market in Washington. Former RCW 82.36.020(2)(c), .022; former RCW 82.38.030(7)(c), .031. In both instances, King Mountain's and Cougar Den's, travel is necessary for trade.

Without travel, most goods have no market. But as *King Mountain* demonstrates, necessity of transport, without an inextricable link between travel and trade, is not sufficient for preemption. 768 F.3d at 997-98. The necessity to bring its burdened goods to market did not entitle King Mountain to an exemption on its escrow obligation. Nor should Cougar Den be entitled to such an exemption.

---

[10] King Mountain also distributed its products outside of Washington. *King Mountain*, 768 F.3d at 997-98.

10

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Cougar Den, Inc. v. Dep't of Licensing*, No. 92289-6
Fairhurst, C.J. (dissenting)

Curiously, the majority claims, "*Smiskin* is nearly identical to this case." Majority at 13. I disagree. The specific provision Harry Smiskin was accused of violating required a wholesaler to "'give[] notice to the [Liquor Control Board] in advance of the commencement of *transportation*'" of unstamped cigarettes. *Smiskin*, 487 F.3d at 1263 (emphasis added) (second alteration in original) (quoting RCW 82.24.250(1)). Transportation was at the very essence of the Washington law at issue in *Smiskin*. *See* RCW 82.24.250(1). Trade was peripheral. Washington's fuel excise tax, on the other hand, accrues "at the time and place of the first taxable event and upon the first taxable person within this state," i.e., *wholesale possession*, not subsequent transportation. Former RCW 82.36.022; former RCW 82.38.031. I fail to see the similarity between *Smiskin* and this case.

C.    The implications of the majority's holding extend beyond this tax regime

The majority is too quick to dismiss the "'parade of horribles'" the State claims could arise from the majority's ruling. Majority at 16. True, felons will not avoid firearm possession charges as a result of this holding, even if they are Yakama Nation members traveling on public highways. Nor would Washington be precluded from regulating the transportation of restricted goods by tribal members. The regulatory exception covers such instances. *Smiskin*, 487 F.3d at 1271.

11

*Cougar Den, Inc. v. Dep't of Licensing*, No. 92289-6
Fairhurst, C.J. (dissenting)

But what this ruling puts at risk is Washington's, and potentially other states', ability to tax goods consumed within its borders. A simple extension of the majority's logic would allow *nontribal members* to avoid the imposition of state use, excise, or sales tax on goods they consume through a contrived transport by Yakama Nation or Nez Perce tribal members.[11] The majority provides no clear limits. Transport is *necessary* to bring many goods to market. *See* Appellant's Opening Br. at 33 (discussing the potential impact on Washington's use tax regime from such a ruling). Does this mean all goods transported to market by Yakama Nation members, regardless of the identity of the buyer and the purpose of transport, are exempt from state tax? Nothing indicates any of the parties understood the Treaty of 1855 to provide for such a right. *See Cree*, 157 F.3d at 766-68 (describing the historical context of treaty negotiations). Yet the majority's ruling seems to create just such a right.

Ours is a case in point. Cougar Den delivers almost all of its fuel to retail gas stations in Washington. Those gas stations, in turn, sell not just to tribal members, but the general public.[12] Cougar Den seeks an exemption from Washington's fuel

---

[11] Both the Nez Perce and Yakama Nation tribes have similar treaty rights to travel. *Cree*, 157 F.3d at 772. The majority's ruling could apply with equal force to transport activities by members of either tribe.

[12] Cougar Den asserts that it provides "fuel [only] to members of the Yakama Nation." Resp't's Br. at 4. But it fails to note that "more than 90 percent of the fuel it imported" during the

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Cougar Den, Inc. v. Dep't of Licensing*, No. 92289-6
Fairhurst, C.J. (dissenting)

excise tax on *all* of the fuel it distributes. Indeed, another Yakama Nation member has made similar claims in California, with detrimental impacts not just to the state's ability to tax, but its competitive business environment. *See Salton Sea Venture, Inc. v. Ramsey*, No. 11CV1968-IEG, 2011 WL 4945072, at *7 (S.D. Cal. Oct. 18, 2011) (court order) (competitor asserts a Yakama Nation member's claimed exemption from the imposition of California's fuel excise tax due based on the treaty right to travel was an unfair business advantage). The majority's ruling would, undoubtedly, provide a basis for further examples.

For the reasons stated above, I dissent. The Yakama Nation's treaty right to travel on public highways does not preclude taxation of Cougar Den's off-reservation fuel distribution activities pursuant to former chapters 82.36 and 82.38 RCW. I would reverse the superior court and affirm the ruling of DOL's director. Like the majority, I would not reach Cougar Den's appearance of unfairness argument because of the de novo review engaged in by this court.

---

period at issue was to tribal members who are "retail gas stations [permitted to] . . . sell to 'any person.'" CP at 1004.

13

*Cougar Den, Inc. v. Dep't of Licensing*, No. 92289-6
Fairhurst, C.J. (dissenting)

Fairhurst, C.J.

Wiggins, J.