**NOTICE: SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion. Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision. Slip opinions can be changed by subsequent court orders. For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion. Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports. An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.** The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports. Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

Filed
Washington State
Court of Appeals
Division Two

February 23, 2022

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| GENE GONZALES and SUSAN GONZALES, HORWATH FAMILY TWO, LLC, and THE WASHINGTON LANDLORD ASSOCIATION, | No. 55915-3-II |
| Appellant, | |
| v. | PUBLISHED OPINION |
| GOVERNOR JAY INSLEE and STATE OF WASHINGTON, | |
| Respondent. | |

MAXA, J. – Gene and Susan Gonzales, Horwath Family Two, LLC, and the Washington Landlord Association (collectively, the appellants) appeal the trial court's grant of summary judgment in favor of Governor Jay Inslee and the State (collectively, the State), dismissing their declaratory judgment action challenging Governor Inslee's proclamations ordering a temporary eviction moratorium related to COVID-19.

In February 2020, Governor Inslee declared a state of emergency in Washington because of COVID-19. In March 2020, he issued a proclamation placing a temporary moratorium on most evictions. The moratorium was amended and extended by several subsequent proclamations until the last version expired on June 30, 2021. The governor then issued an eviction bridge proclamation, which expired on October 31, 2021.

No. 55915-3-II

Gonzales and Horwath provided rental housing in Lewis County, and their tenants had not paid rent since the governor's proclamation was issued. The appellants filed this action in Lewis County, seeking a declaration that the governor had no statutory authority to issue the eviction moratorium and the moratorium violated several constitutional provisions. The State then filed a motion to transfer venue to Thurston County, which the Lewis County trial court granted.

We hold that (1) this appeal is not moot because the case presents issues of substantial public interest, (2) the Lewis County trial court did nor err in transferring venue to Thurston County, (3) the Governor had authority to issue the proclamations under RCW 43.06.220(1)(h), (4) RCW 43.06.220(1)(h) did not violate the constitutional prohibition against the delegation of legislative authority, (5) the proclamations did not violate the separation of powers doctrine or deny access to the courts, (6) the proclamations did not constitute a taking of the appellants' property, and (7) the proclamations did not constitute an unconstitutional impairment of the appellants' contracts with their tenants.

Accordingly, we affirm the trial court's grant of summary judgment in favor of the State.

FACTS

*Background*

In response to the COVID-19 pandemic, on February 29, 2020 Governor Inslee declared a state of emergency in Washington. On March 18, 2020, the governor issued Proclamation 20-19,[1] which prohibited certain activities related to residential evictions under the authority of RCW 43.06.220(1)(h). The effect was to put a temporary moratorium on most residential

---

[1] Proclamation of Governor Jay Inslee, No. 20-19 (Wash. March 18, 2020), https://www.governor.wa.gov/sites/default/files/proclamations/20-19%20-%20COVID-19%20Moratorium%20on%20Evictions%20%28tmp%29.pdf [https://perma.cc/BBN9-QEM8].

No. 55915-3-II

evictions. The moratorium aimed to protect those with the inability to pay rent from being evicted from their homes in the midst of the pandemic. The purpose of the moratorium was to prevent increasing risks to life, health, and safety from the pandemic.

The governor issued subsequent proclamations that extended the eviction moratorium several times and provided much more detailed provisions: Proclamations 20-19.1[2], 20-19.2[3], 20-19.3[4], 20-19.4[5], and 20-19.5.[6] The final proclamation regarding the eviction moratorium, Proclamation 20-19.6[7], expired on June 30, 2021 and was not renewed. These proclamations prohibited landlords and related persons from engaging in a number of activities regarding evictions, which essentially prevented most evictions. One exception was if eviction was necessary because the tenant was creating a "significant and immediate risk to the health or

---

[2] Proclamation of Governor Jay Inslee, No. 20-19.1 (Wash. Apr. 16, 2020), https://www.governor.wa.gov/sites/default/files/proclamations/20-19.1%20-%20COVID-19%20Moratorium%20on%20Evictions%20Extension%20%28tmp%29.pdf [https://perma.cc/G9YP-7HYP].

[3] Proclamation of Governor Jay Inslee, No. 20-19.2 (Wash. June 2, 2020), https://www.governor.wa.gov/sites/default/files/proclamations/20-19.2%20Coronavirus%20Evictions%20%28tmp%29.pdf [https://perma.cc/8VTV-9HK9].

[4] Proclamation of Governor Jay Inslee, No. 20-19.3 (Wash. July 24, 2020), https://www.governor.wa.gov/sites/default/files/proclamations/20-19.3%20Coronavirus%20Evictions%20%28tmp%29.pdf [https://perma.cc/7GB3-MJKT].

[5] Proclamation of Governor Jay Inslee, No. 20-19.4 (Wash. Oct. 14, 2020), https://www.governor.wa.gov/sites/default/files/proclamations/proc_20-19.4.pdf [https://perma.cc/L2AS-CX23].

[6] Proclamation of Governor Jay Inslee, No. 20-19.5 (Wash. Dec. 31, 2020), https://www.governor.wa.gov/sites/default/files/proclamations/proc_20-19.5.pdf [https://perma.cc/CZ98-WPHB].

[7] Proclamation of Governor Jay Inslee, No. 20-19.6 (Wash. March 18, 2021), https://www.governor.wa.gov/sites/default/files/proclamations/proc_20-19.6.pdf [https://perma.cc/X9AS-5MTR].

3

No. 55915-3-II

safety of others." Proclamation 20-19.1 at 3. An exception later was added for when the landlord planned to personally occupy or sell the rented premises.

The proclamations also prohibited landlords from treating unpaid rent resulting from COVID-19 as an enforceable debt, unless the landlord offered and the tenant refused a reasonable repayment plan.

In April 2021, the legislature enacted Engrossed Second Substitute Senate Bill (E2SSB) 5160. LAWS of 2021, ch.115. Section 1 of E2SSB 5160 noted the governor's temporary moratorium on evictions "to reduce housing instability and enable tenants to stay in their homes." LAWS of 2021, ch. 115, sec. 1. E2SSB stated that the Governor's eviction moratorium would end on June 30, 2021. RCW 59.18.630.

E2SSB 5160 provided a number of protections for tenants, including that landlords must offer tenants a reasonable schedule for repayment of unpaid rent accruing between March 1, 2020 and six months after expiration of the eviction moratorium. RCW 59.18.630. In addition, the legislation provided for the development of court-based eviction pilot programs to facilitate the resolution of nonpayment of rent cases between landlords and tenants. LAWS OF 2021, ch. 115, sec. 7. E2SSB 5160 also allowed landlords to recover up to $15,000 from the State in unpaid rent if the tenant voluntary vacated a tenancy or if a tenant defaulted on a payment plan. RCW 43.31.605 (1)(d)(i). And it was required that landlords be given the opportunity to apply for certain rental assistance programs. LAWS OF 2021, ch. 115, sec. 12.

On June 29, 2021, the governor issued Proclamation 21-09[8] as a temporary bridge between the expired eviction moratorium and the implementation of E2SSB 5160. This

---

[8] Proclamation by Governor Jay Inslee, No. 21-09 (Wash. June 29, 2021), https://www.governor.wa.gov/sites/default/files/proclamations/proc_21-09.pdf [https://perma.cc/5FLT-5THF].

4

No. 55915-3-II

proclamation continued to prohibit evictions until certain provisions of E2SSB 5160 were implemented. Proclamation 21-09 was extended once, Proclamation 21-09.1[9], and expired on October 31, 2021.

*Lawsuit and Summary Judgment*

Gonzales and Horwath provided rental housing in Lewis County. Tenant X had been with the Gonzales' since 2019. Tenant X had not paid rent or utilities since June 2020. The Gonzales' asked tenant X if they planned to pay utilities and tenant X reportedly responded with "[w]hy should I pay them anything; they can't shut me off due to the Pandemic." CP at 252.

Tenant Y rented with Horwath. Tenant Y had not paid rent since February 2020 or utilities since March 2020. A rental management company attempted to contact tenant Y about finding a solution for paying and to inquire about tenant Y's plans or ability to pay. Tenant Y did not respond to the inquiries. No repayment plan was offered because tenant Y would not respond to any communications.

In December 2020, Gonzales and Horwath, joined by the Washington Landlord Association, filed a declaratory judgment action in Lewis County against Governor Inslee and the State. They sought an order declaring that the governor's proclamations ordering an eviction moratorium were void as being without statutory authority and unconstitutional under various provisions, and an order declaring that the proclamations had caused an unconstitutional taking without compensation.

---

[9] Proclamation by Governor Jay Inslee, No. 21-09.1 (Wash. Sept. 24, 2021), https://www.governor.wa.gov/sites/default/files/proclamations/proc_21-09.1.pdf [https://perma.cc/H2LM-KFZ3].

No. 55915-3-II

The State filed a motion to change venue from Lewis County to Thurston County. The Lewis County trial court granted the motion under RCW 4.12.020(2) because the case involved a lawsuit against a public officer for an act done by the governor in virtue of his office.

Both parties subsequently filed summary judgment motions. The parties submitted declarations supporting the facts stated above. The trial court granted the State's motion on all claims and denied the appellants' motion.

The appellants appeal the trial court's summary judgment order.

ANALYSIS

A.      SUMMARY JUDGMENT STANDARD

Where the parties do not dispute the material facts of the case, we will affirm a grant of summary judgment if the moving party is entitled to judgment as a matter of law. *Wash. State Legislature v. Inslee*, 198 Wn.2d 561, 569, 498 P.3d 496 (2021).

B.      LANGUAGE OF PROCLAMATIONS

1.    Preamble

Proclamation 20-19 and subsequent versions all contained similar preamble language explaining the basis of the eviction moratorium:

> WHEREAS, the COVID-19 pandemic is expected to cause a sustained global economic slowdown, which is anticipated to cause an economic downturn throughout Washington State with layoffs and reduced work hours for a significant percentage of our workforce due to substantial reductions in business activity. . . ; and
>
> WHEREAS, many in our workforce expect to be impacted by these layoffs and substantially reduced work hours are anticipated to suffer economic hardship that will disproportionately affect low and moderate income workers resulting in lost wages and potentially the inability to pay for basic household expenses, including rent; and

6

No. 55915-3-II

WHEREAS, the inability to pay rent by these members of our workforce increases the likelihood of eviction from their homes, increasing the life, health and safety risks to a significant percentage of our people from the COVID-19 pandemic; and . . . .

WHEREAS, a temporary moratorium on evictions throughout Washington State at this time will help reduce economic hardship and related life, health, and safety risks to those members of our workforce impacted by layoffs and substantially reduced work hours or who are otherwise unable to pay rent as a result of the COVID-19 pandemic.

Proclamation 20-19 at 1-2.

Proclamation 20-19.1 and subsequent versions added the following to the preamble:

WHEREAS, tenants, residents, and renters who are not materially affected by COVID-19 should and must continue to pay rent, to avoid unnecessary and avoidable economic hardship to landlords, property owners, and property managers who are economically impacted by the COVID-19 pandemic; . . . .

WHEREAS, it is critical to protect tenants and residents of traditional dwellings from homelessness. . . . ; . . . .

WHEREAS, a temporary moratorium on evictions and related actions will reduce housing instability, enable residents to stay in their homes unless conducting essential activities or employment in essential business services, and promote public health and safety by reducing the progression of COVID-19 in Washington State.

Proclamation 20-19.1 at 1-2.

Proclamation 20-19.4 added the following: "WHEREAS, hundreds of thousands of tenants in Washington are unable to pay their rent, reflecting the continued financial precariousness of many in the state." Proclamation 20-19.4 at 3. Proclamation 20-19.5 stated, "WHEREAS, as of November 2020, current information suggests that at least 165,000 tenants in Washington will be unable to pay their rent in the near future, reflecting the continued financial precariousness of many in the state." Proclamation 20-19.5 at 2. Proclamation 20-19.6 stated, "WHEREAS, as of March 2021, current information suggests that at least 76,000 tenants in

7

No. 55915-3-II

Washington will be unable to pay their rent in the near future, reflecting the continued financial precariousness of many in the state." Proclamation 20-19.6 at 3.

2.    Eviction Moratorium

Proclamation 20-19 stated that landlords generally were prohibited under RCW 43.06.220(1)(h) from engaging in the following activities: (1) "serving a notice of unlawful detainer for default payment of rent," (2) "issuing a 20-day notice for unlawful detainer," and (3) "initiating judicial action seeking a writ of restitution involving a dwelling unit if the alleged basis for the writ is the failure of the tenant or tenants to timely pay rent." Proclamation 20-19 at 2-3.

Proclamation 20-19.1 adopted different and expanded language, generally prohibiting, under RCW 43.06.220(1)(h), landlords from engaging in a number of activities, including: (1) "serving or enforcing, or threatening to serve or enforce, any notice requiring a resident to vacate any dwelling . . . , including but not limited to an eviction notice, notice to pay or vacate, notice of unlawful detainer, notice of termination of rental, or notice to comply or vacate"; and (2) "seeking or enforcing, or threatening to seek or enforce, judicial eviction orders." Proclamation 20-19.1 at 3-4.  All the subsequent proclamations contained these prohibitions.

Proclamation 20-19.1 and subsequent proclamations contained an exception if the prohibited eviction activities were "necessary to respond to a significant and immediate risk to the health or safety of others created by the resident." Proclamation 20-19.1 at 3.  Proclamation 20-19.2 and subsequent proclamations added an exception for when the property owner planned to personally occupy or sell the rental property.  Proclamation 20-19.2 at 3.

Proclamation 20-19.1 also contained the following provision:

Except as provided in this paragraph, landlords, property owners, and property managers are prohibited from treating any unpaid rent or other charges related to a

8

No. 55915-3-II

> dwelling or parcel of land occupied as a dwelling as an enforceable debt or obligation that is owing or collectable, where such non-payment was as a result of the COVID-19 outbreak and occurred on or after February 29, 2020.

Proclamation 20-19.1 at 4. However, this prohibition contained the following exception:

> This prohibition does not apply to a landlord, property owner, or property manager who demonstrates by a preponderance of the evidence to a court that the resident was offered, and refused or failed to comply with, a re-payment plan that was reasonable based on the individual financial, health, and other circumstances of that resident.

Proclamation 20-19.1 at 4 (emphasis omitted). All the subsequent proclamations contained these provisions.

    3.    Conclusion Language

Proclamation 20-19.1 contained the following conclusion language: "FURTHERMORE, it is the intent of this order to prevent a potential new devastating impact of the COVID-19 outbreak – that is, a wave of statewide homelessness that will impact every community in our state." Proclamation 20-19.1 at 5 (emphasis omitted). All the subsequent proclamations contained this provision.

Beginning with Proclamation 20-19.3 in July 2020, all the proclamations contained the following provision:

> MOREOVER, as Washington State begins to emerge from the current public health and economic crises, I recognize that courts, tenants, landlords, property owners, and property managers may desire additional direction concerning the specific parameters for reasonable repayment plans related to outstanding rent or fees. This is best addressed by legislation, and I invite the state Legislature to produce legislation as early as possible during their next session to address this issue. I stand ready to partner with our legislators as necessary and appropriate to ensure that the needed framework is passed into law.

Proclamation 20-19.3 at 7 (emphasis omitted).

9

No. 55915-3-II

C.     MOOTNESS OF APPEAL

The State argues that the issue is moot because the moratorium has expired.  The appellants argue that even if the case is moot, it should be resolved because there are matters of substantial public interest.  We agree with the appellants.

An appeal is moot if we no longer can provide effective relief.  *Dzaman v. Gowman*, 18 Wn. App. 2d 469, 476, 491 P.3d 1012 (2021).  However, we may exercise our discretion to review a moot appeal when it involves issues of continuing and substantial public interest.  *Id.* Three factors determine whether we will exercise our discretion: " '(1) the public or private nature of the question presented, (2) the desirability of an authoritative determination to provide future guidance to public officers, and (3) the likelihood that the question will recur.' " *Id.* (quoting *Thomas v. Lehman*, 138 Wn. App. 618, 622, 158 P.3d 86 (2007)).

These three factors support considering this appeal.  At first glance, this appeal appears to be moot because the eviction moratorium expired in June 2021 and the bridge moratorium expired in October 2021.  But the COVID-19 pandemic is not over.  And because the pandemic persists, it is possible that the governor may institute another, similar eviction moratorium in the future.  Therefore, this case presents issues of continuing and substantial public interest.

D.     CHANGE OF VENUE

The appellants argue that the Lewis County trial court improperly transferred venue to Thurston County.  We disagree.

The venue of an action is determined by statute.  *Clark County v. Portland Vancouver Junction R.R., LLC*, 17 Wn. App. 2d 289, 292, 485 P.3d 985 (2021).  When two different venue statutes apply to a lawsuit, we will apply " 'mandatory statutes to the exclusion of permissive

No. 55915-3-II

ones and specific statutes to the exclusion of general ones.' " *Id.* at 293 (quoting *Ralph v. Weyerhaeuser Co.*, 187 Wn.2d 326, 338, 386 P.3d 721 (2016)).

RCW 4.12.010(1) states that venue shall be in the county where the subject of the action is located "for any injuries to real property." RCW 4.92.010 states that the venue of lawsuits against the State shall be in one of several places, including the county of the residence of one or more plaintiffs and "[t]he county in which the real property that is the subject of the action is situated." The appellants rely on these statutes to argue that venue was proper in Lewis County, where they resided and where their rental properties were located.

However, RCW 4.12.020(2) states that for actions "against a public officer . . . for an act done by him or her in virtue of his or her office," venue shall be "in the county where the cause of action, or some part thereof, arose." The State relies on this statute to argue that venue was proper only in Thurston County, where the governor issued the proclamations.

The Supreme Court has stated that when RCW 4.12.020(2) applies, "venue in the specified county is mandatory." *Johnson v. Inslee*, 198 Wn.2d 492, 496, 496 P.3d 1191 (2021). Therefore, the only question here is whether RCW 4.12.020(2) applies to this action.

The Supreme Court's decision in *Johnson* resolves this issue. In that case, a State employee filed a lawsuit against Governor Inslee and other State entities in Franklin County, challenging the governor's proclamation requiring all State employees to be vaccinated against COVID-19. 198 Wn.2d at 494-95.

Regarding where the cause of action arose, the court relied on cases from other states to conclude that "it is the official act itself – the act for which redress is sought – that 'gives rise' to the cause of action, and thus venue is proper in the county where the act is made." *Id.* at 496-97. Therefore, the court held that the cause of action regarding the governor's proclamation arose

11

No. 55915-3-II

only in Thurston County, where he performed the act of issuing it. *Id.* at 498-99. The court stated, "To conclude otherwise would mean a statewide public official such as the governor could be haled into superior courts throughout the state to defend similar suits challenging a single act having statewide effect, as this case itself exemplifies." *Id.* at 497.

Regarding the "in virtue of office" requirement, the court stated, "[R]egardless of whether the governor exceeded his constitutional authority, which has not yet been determined, he plainly acted 'in virtue of his . . . office' in issuing emergency proclamations pursuant to his statutory authority under RCW 43.06.220." *Id.* at 498. The court concluded, "The governor issued his proclamations 'in virtue' of his 'office' within the meaning of RCW 4.12.020(2)." *Id.*

Based on this analysis, the court held that Thurston County was the mandatory venue for the action challenging the governor's vaccine proclamation. *Id.* at 498-99.

The appellants argue that *Johnson* is distinguishable because that case did not involve real property. They claim that RCW 4.12.020(2) cannot trump RCW 4.12.010(1) and RCW 4.92.010. But the court in *Johnson* expressly stated that RCW 4.12.020(2) is mandatory if that statute applies. 198 Wn.2d at 496. Therefore, it *does* trump other venue statutes. *See Portland Vancouver Junction R.R*, 17 Wn. App. 2d at 293.

The appellants also argue under RCW 4.12.020 that "some part" of their cause of action arose in Lewis County because their injuries occurred in Lewis County. But the same was true in *Johnson*, and the court in that case rejected a similar argument. 198 Wn.2d at 497 n.6. The court expressly held that the "cause of action challenging the lawfulness of the proclamations 'arose' *only* in Thurston County." *Id.* at 498-99 (emphasis added).

We hold that the Lewis County trial court did not err in transferring venue to Thurston County.

12

No. 55915-3-II

E.      GOVERNOR'S AUTHORITY UNDER RCW 43.06.220(1)(h) TO ISSUE PROCLAMATIONS

Appellants argue that the governor did not have authority under RCW 43.06.220(1)(h) to issue Proclamation 20-19 and the subsequent proclamations. We disagree.

1.    Legal Principles

"The executive branch has historically led Washington's response to emergencies." *Colvin v. Inslee*, 195 Wn.2d 879, 895, 467 P.3d 953 (2020). RCW 43.06.010(12) states, "The governor may, after finding that a public disorder, disaster, energy emergency, or riot exists within this state or any part thereof which affects life, health, property, or the public peace, proclaim a state of emergency in the area affected." A declaration of a state of emergency activates the governor's broad powers in emergencies. *Colvin*, 195 Wn.2d at 895. Various statutes "evidence a clear intent by the legislature to delegate requisite police power to the governor in times of emergency. The necessity for such delegation is readily apparent." *Cougar Bus. Owners' Assoc. v. State*, 97 Wn.2d 466, 474, 647 P.2d 481 (1982), *overruled in part by Chong Yim v. City of Seattle*, 194 Wn.2d 682, 451 P.3d 694 (2019).

RCW 43.06.220(1) provides:

The governor after proclaiming a state of emergency and prior to terminating such, may, in the area described by the proclamation issue an order prohibiting:
. . . .

(h) *Such other activities as he or she reasonably believes should be prohibited to help preserve and maintain life, health, property or the public peace.*

(Emphasis added.)

RCW 43.06.220(2) states, "The governor after proclaiming a state of emergency and prior to terminating such may, in the area described by the proclamation, issue an order or orders concerning waiver or suspension of statutory obligations or limitations" in certain specified

13

No. 55915-3-II

areas. A waiver or suspension of statutory obligations or limitations under subsection (2) may not continue for longer than 30 days unless extended by the legislature. RCW 43.06.220(4).

We review de novo issues of statutory interpretation. *Wright v. Lyft, Inc.*, 189 Wn.2d 718, 722, 406 P.3d 1149 (2017). The goal in interpreting a statute is to determine and give effect to the legislature's intent. *Id.* The court considers the language of the statute, the context of the statute, related statutes, and the statutory scheme as a whole. *Gray v. Suttell & Assocs.*, 181 Wn.2d 329, 339, 334 P.3d 14 (2014). The interpretation ends if the plain language is unambiguous. *Jametsky v. Olsen*, 179 Wn.2d 756, 762, 317 P.3d 1003 (2014). But if more than one reasonable interpretation exists, the court will resolve it by turning to other sources of legislative intent, including statutory construction, legislative history, and case law. *Id.*

2.    Analysis

Here, the plain language of RCW 43.06.220(1)(h) is unambiguous. The governor may issue an order prohibiting *any* activities the governor reasonably believes should be prohibited "to help preserve and maintain life, health, property or the public peace." RCW 43.06.220(1)(h). The term "activities" is extremely broad, and is broad enough to include the actions the proclamations prohibited regarding evictions and unpaid rent. And the proclamation preambles made it clear that the governor reasonably believed that prohibiting those activities was necessary to preserve life, health, and property.

The appellants argue that the proclamations suspended rights and obligations established by various statutes, including the obligation of tenants to pay rent and the right of landlords to evict tenants who do not pay rent. They emphasize that RCW 43.06.220(1)(h) does not authorize the governor to suspend the operation of statutes. And they claim that if RCW 43.06.220(1)(h) is interpreted to allow the suspension of statutes, subsection (2) – which does expressly authorize

14

No. 55915-3-II

the suspension of statutory obligations or limitations in certain areas – would be rendered superfluous.

However, none of the proclamations stated that the governor was suspending any statutes. Tenants still were subject to the statutory obligation to pay rent set forth in RCW 59.18.110; they simply could not be evicted for failing to pay rent. The moratorium may have delayed the ability of landlords to exercise the statutory remedy of eviction stated in RCW 59.12.030 in many cases, but the operation of that statute was not suspended. The wrongful detainer statute still could be invoked if "necessary to respond to a significant and immediate risk to the health and safety of others created by the resident," Proclamation 20-19.1 at 3, or if the property owner planned to personally occupy or sell the rental property.

Instead of suspending any statutes, the governor prohibited certain specific activities, as RCW 43.06.220(1)(h) expressly authorized. Nothing in RCW 43.06.220(1)(h) suggests that the governor is not authorized to prohibit activities that may involve statutory rights and obligations.

We hold that RCW 43.06.220(1)(h) authorized the governor to issue the proclamations providing for an eviction moratorium.[10]

F.      DELEGATION OF LEGISLATIVE AUTHORITY

Appellants argue that if RCW 43.06.220(1)(h) authorized the issuance of an eviction moratorium, it violated the constitutional prohibition of delegation of legislative authority. We disagree.

---

[10] The State argues that even if the proclamations exceeded the governor's authority under RCW 43.06.220(1)(h), the legislature's enactment of E2SSB 5160 ratified the governor's reliance on that statute to issue the eviction moratorium. Because we hold that the governor did have authority, we do not address this issue.

15

No. 55915-3-II

Article 2, section 1 (amendment 72) of the Washington Constitution states that "[t]he legislative authority of the state of Washington shall be vested in the legislature." As a result, the legislature cannot delegate purely legislative functions to other branches of government. *Auto. United Trades Org. v. State*, 183 Wn.2d 842, 859, 357 P.3d 615 (2015). "These nondelegable powers include the power to enact, suspend, and repeal laws." *Diversified Inv. P'ship v. Dep't of Soc. & Health Servs.*, 113 Wn.2d 19, 24, 775 P.2d 947 (1989).

As noted above, none of the proclamations stated that the governor was suspending any statutes. And the proclamations did not suspend the operation of any statutes. Instead, the governor prohibited certain specific activities as RCW 43.06.220(1)(h) expressly authorized.

We hold that RCW 43.06.220(1)(h) did not violate the constitutional prohibition of delegation of legislative authority.

G.    SEPARATION OF POWERS AND DENIAL OF ACCESS TO COURTS

Appellants argue that the proclamations violated the separation of powers doctrine and denied them access to the courts for judicial relief. We disagree.

1.    Separation of Powers

The Washington Constitution does not contain a formal separation of powers clause, but " 'the very division of our government into different branches has been presumed throughout our state's history to give rise to a vital separation of powers doctrine.' " *Brown v. Owen*, 165 Wn.2d 706, 718, 206 P.3d 310 (2009) (quoting *Carrick v. Locke*, 125 Wn.2d 129, 135, 882 P.2d 173 (1994)). The doctrine ensures "that the fundamental functions of each branch remain inviolate." *Hale v. Wellpinit Sch. Dist. No. 49*, 165 Wn.2d 494, 504, 198 P.3d 1021 (2009). A branch violates the separation of powers doctrine when an action "threatens the independence or

16

No. 55915-3-II

integrity or invades the prerogatives of another." *City of Fircrest v. Jensen*, 158 Wn.2d 384, 394, 143 P.3d 776 (2006).

Here, the proclamations do not interfere with a court's authority in any way. None of the proclamation provisions are directed to the courts, and the proclamations do not purport to prevent the courts from taking any actions. For example, the proclamations do not prohibit courts from issuing eviction orders or otherwise resolving disputes between landlords and tenants. Instead, the proclamations' prohibitions are directed at landlords and related persons. Preventing a person from requesting or enforcing eviction orders does not invade the prerogatives of the judicial branch. Therefore, we hold that the proclamations did not violate the separation of powers doctrine.

2. Access to Courts

a. Legal Principles

"The people have a right of access to courts; indeed, it is 'the bedrock foundation upon which rest all the people's rights and obligations.' " *Putman v. Wenatchee Valley Med. Ctr., P.S.*, 166 Wn.2d 974, 979, 216 P.3d 374 (2009) (quoting *John Doe v. Puget Sound Blood Ctr.*, 117 Wn.2d 772, 780, 819 P.2d 370 (1991)). The right of access to courts derives in part from the First Amendment to the United States Constitution and article I, section 4 of the Washington Constitution. *Leishman v. Ogden Murphy Wallace, PLLC*, 196 Wn.2d 898, 914, 479 P.3d 688 (2021). There also is a due process component. *In re Marriage of Giordano*, 57 Wn. App. 74, 77, 787 P.2d 51 (1990). The right of access is implicated where there is a delay or total blockage of a person's ability to file suit. *Musso-Escude v. Edwards*, 101 Wn. App. 560, 566, 4 P.3d 151 (2000).

No. 55915-3-II

However, " '[t]here is no absolute and unlimited constitutional right of access to courts. All that is required is a reasonable right of access – a reasonable opportunity to be heard.' " *Giordano*, 57 Wn. App. at 77 (quoting *Ciccarelli v. Carey Can. Mines, Ltd.*, 757 F.2d 548, 554 (3d Cir.1985)). "[W]hen access to the courts is not essential to advance a fundamental right . . . access may be regulated if the regulation rationally serves a legitimate end." *Giordano*, 57 Wn. App. at 77; *see also Yurtis v. Phipps*, 143 Wn. App. 680, 694, 181 P.3d 849 (2008). And access to the courts itself is not a fundamental right. *Ford Motor Co. v. Barrett*, 115 Wn.2d 556, 562, 800 P.2d 367 (1990).

b. Analysis

Here, the governor's proclamations did not completely restrict access to the courts. There were exceptions to the eviction moratorium if the tenant created health and safety risks to others, and if the property owner planned to personally occupy or sell the rental property. Landlords could treat unpaid rent as an enforceable obligation and could sue on that obligation if the tenant refused or failed to comply with a reasonable repayment plan. And a landlord's ability to bring eviction proceedings only was delayed until the expiration of the final proclamation, not extinguished completely.

Because the proclamations regulated but did not completely deny access to the courts, we analyze the appellants' access to courts claim under a rational basis approach. *See Giordano*, 57 Wn. App. at 77. Under this approach, the question is whether the eviction moratorium "rationally serves a legitimate end." *Id.*

The State's purpose in preventing the spread and transmission of COVID-19 undoubtedly is significant and important. *See*, *e.g.*, *Roman Catholic Diocese of Brooklyn v. Cuomo*, ___ U.S. ___, 141 S. Ct. 63, 67, 208 L. Ed.2d 206 (2020) (stating that "[s]temming the spread of COVID-

18

19 is unquestionably a compelling interest."). So is preventing widespread homelessness caused by economic distress related to the COVID-19 pandemic.

In addition, the eviction moratorium was a rational means to achieve this important purpose. As the governor noted in his proclamations, the COVID-19 pandemic was causing adverse economic consequences for a large number of people, potentially resulting in a widespread inability to pay rent and evictions. Evictions would increase the health and safety risks from the pandemic for people forced into homelessness. Conversely, a moratorium on evictions would allow people to stay in their homes, thereby promoting health and safety and helping to prevent the progression of the pandemic.

Several federal cases have rejected access to courts challenges to restrictions on evictions related to COVID-19. *Heights Apts., LLC v. Walz*, 510 F. Supp. 3d 789, 810-11 (D. Minn. 2020), *appeal filed*, No. 21-1278 (8th Cir. Feb. 5, 2021); *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 393-96 (D. Mass. 2020); *Elmsford Apt. Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 174-75 (S.D.N.Y. 2020), *appeal dismissed*, 860 F. App'x 215 (2d Cir. 2021).

The appellants rely on a trial court decision from the District of Columbia in which the court ruled that an eviction moratorium violated the constitutional right to access using an intermediate scrutiny analysis. However, the D.C. Court of Appeals reversed this decision and held that the moratorium did not violate the right to access. *Dist. of Columbia v. Towers*, 260 A.3d 690, 693-96 (D.C. App. 2021).

We hold that the eviction moratorium did not violate the appellants' right of access to the courts.

19

No. 55915-3-II

H.    TAKING PROPERTY WITHOUT COMPENSATION

The appellants argue that the temporary eviction moratorium constituted a per se physical taking of their property because the moratorium deprived them of the right to evict tenants from their property.  We disagree.[11]

1.    Legal Principles

The Fifth Amendment to the United States Constitution states that private property shall not be "taken for public use, without just compensation."  Article I, section 16 of the Washington Constitution provides, "No private property shall be taken or damaged for public or private use without just compensation having been first made."  Washington courts generally apply the federal takings analysis.  *See Chong Yim*, 194 Wn.2d at 658-59.

There are two general types of takings: (1) a physical taking, where "the government authorizes a physical occupation of property"; and (2) a regulatory taking, "where the government merely regulates the use of property."  *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 522 112 S. Ct. 1522, 118 L. Ed.2d 153 (1992).  The first type is subject to a per se rule: if a physical taking has occurred, the government must pay compensation.  *Cedar Point Nursery v. Hassid*, ___ U.S. ___, 141 S. Ct. 2063, 2071, 210 L. Ed. 2d 369 (2021).  "Whenever a regulation results in a physical appropriation of property, a per se taking has occurred."  *Id.* at 2072.  In addition, "a physical appropriation is a taking whether it is permanent or temporary."  *Id.* at 2074.

---

[11] There is some question whether the appellants are entitled to an equitable remedy – a declaratory judgment – on their takings claim.  The remedy for a government taking is compensation through a damages award, but the appellants' complaint does not request damages.  However, the State does not argue that we should decline to address the takings claim, and therefore we do not address this issue.

20

No. 55915-3-II

The second type of taking is analyzed using a flexible, balancing test adopted in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978). *Cedar Point Nursery*, 141 S. Ct. at 2072.

The appellants allege only that the temporary eviction moratorium constituted a physical, per se taking. They do not argue that the moratorium was a regulatory taking under *Penn Central*.

2. Analysis

The appellants argue that the eviction moratorium constituted a physical, per se taking because it required them to allow tenants to reside in their property without the payment of rent. Relying on *Cedar Point Nursery*, they claim that precluding evictions essentially forced them to submit to a physical occupation of their property.

This argument is inconsistent with the United States Supreme Court's analysis in *Yee*. In that case, mobile park owners who rented pads to the owners of mobile homes challenged a state statute that among other things (1) limited their ability to terminate a mobile home owner's tenancy, (2) did not allow them to remove a mobile home if it was sold, and (3) required them to continue renting to a mobile home purchaser as long as the purchaser had the ability to pay rent. *Yee*, 503 U.S. at 524. The City of Escondido subsequently adopted a rent control ordinance that dictated the rent the mobile park owners could charge. *Id.* at 524-25. The mobile park owners argued that the statute and ordinance resulted in a physical, per se taking because they were precluded from fully using and occupying their property. *Id.* at 525. Instead, the right to physically occupy their property – at submarket rent – essentially had been transferred indefinitely to the mobile home owners and their successors. *Id.* at 527.

21

No. 55915-3-II

The Court stated that this argument was inconsistent with the law of physical takings. *Id.* The court stated, "The government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land. 'This element of required acquiescence is at the heart of the concept of occupation.' " *Id.* (quoting *FCC v. Florida Power Corp.*, 480 U.S. 245, 252, 107 S. Ct. 1107, 1112, 94 L. Ed. 2d 282 (1987)). However, the Court emphasized that the statute and the ordinance had not *required* the occupation of the mobile park – the mobile park owners had voluntarily rented their property to the mobile home owners. *Yee*, 503 U.S. at 527. "Put bluntly, no government has required any physical invasion of petitioners' property. Petitioners' tenants were invited by petitioners, not forced upon them by the government." *Id.* at 528.

The Court concluded:

> On their face, the state and local laws at issue here merely regulate petitioners' use of their land by regulating the relationship between landlord and tenant. "This Court has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails."

*Id.* at 528-29 (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 440, 102 S. Ct. 3164, 73 L. Ed. 2d 868 (1982)).

The appellants rely on *Cedar Point Nursery*. In that case, a labor regulation required agricultural employers to permit union organizers on their property for three hours a day, 120 days per year, for the purpose of soliciting employees to join or form a union. *Cedar Point Nursery*, 141 S. Ct. at 2069. The court emphasized that the regulation allowed union organizers to physically enter and occupy the property. *Id.* at 2072. "The regulation appropriates a right to physically invade the growers' property – to literally 'take access,' as the regulation provides." *Id.* at 2074. Therefore, the court held that the regulation was a per se physical taking. *Id.*

22

No. 55915-3-II

This case is similar to *Yee* and is dissimilar to *Cedar Point Nursery*. As in *Yee*, the eviction moratorium did not require the appellants to submit to the physical occupation of their property. Instead, the appellants were the ones who invited their tenants to occupy their rental property. And unlike in *Cedar Point Nursery*, the moratorium did not require that the appellants allow third parties to enter and take access to their property. The proclamations merely operated to "regulate [appellants'] use of their land by regulating the relationship between landlord and tenant." *Yee*, 503 U.S. at 528. Therefore, we conclude that the eviction moratorium did not constitute a physical per se taking.

This conclusion is supported by federal courts in Washington and in other jurisdictions that have ruled that eviction moratoriums do not constitute an unconstitutional physical taking without compensation. *E.g.*, *Jevons v. Inslee*, 2021 WL 4443084, *11-15 (E.D. Wash. 2021), *appeal filed*, No. 22-35050 (9th Cir Jan. 18, 2022); *El Papel, LLC v. Durkan*, No. 2:20-cv-01323-RAJ-JRC, 2021 WL 4272323, at *15-17 (Sept. 15, 2021) (Magistrate's report and recommendation), *adopted by court*, 2021 WL 71678 (W.D. Wash. Jan. 8, 2022); *Heights Apts.*, 510 F. Supp. 3d at 812; *Baptiste*, 490 F. Supp. 3d at 388; *Auracle Homes, LLC v. Lamont*, 478 F. Supp. 3d 199, 220-21 (D. Conn. 2020); *Elmsford Apt. Assocs.*, 469 F. Supp. 3d at 162-64.

We hold that the eviction moratorium did not constitute an unconstitutional taking without compensation.[12]

---

[12] The appellants also briefly argue that the eviction moratorium took the rental income to which they were entitled. But it is undisputed that the moratorium did not eliminate the appellants' ability to collect the full amount of past rent due, as long as they offered a reasonable repayment plan to their tenants.

23

No. 55915-3-II

I.      IMPAIRMENT OF CONTRACTUAL RELATIONSHIP

The appellants argue that the temporary eviction moratorium unconstitutionally impaired their contractual relationship with their tenants. We disagree.

    1.    Legal Standard

Article I, section 10 of the United States Constitution states, "No State shall . . . pass any . . . law impairing the obligation of contracts." Article I, section 23 of the Washington Constitution provides that "[n]o . . . law impairing the obligations of contracts shall ever be passed." The standards under the two provisions are the same. *Lenander v. Dept. of Ret. Sys.*, 186 Wn.2d 393, 414, 377 P.3d 199 (2016).

"[A] constitutional violation will be found only if the challenged action substantially impairs an existing contract and, even then, only if the action was not reasonable and necessary to serve a legitimate public purpose." *Id.* We apply a three-part test: "(1) Does a contractual relationship exist; (2) does the legislation substantially impair the relationship; and (3) if there is a substantial impairment, is the impairment reasonable and necessary to serve a legitimate public purpose?" *Id.*

If the government is not one of the contracting parties, as here, the court must " 'defer to legislative judgment as to the necessity and reasonableness of a particular measure.' " *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 413, 103 S. Ct. 697, 74 L. Ed. 2d 569 (1983) (quoting *United States Trust Co. v. New Jersey*, 431 U.S. 1, 22-23, 97 S. Ct. 1505, 52 L. Ed. 2d 92 (1977)).

Both parties discuss *Home Building & Loan Association v. Blaisdell*, 290 U.S. 398, 54 S. Ct. 231, 78 L. Ed. 413 (1934). In that Great Depression-era case, the United States Supreme Court upheld a mortgage moratorium law that, among other things, extended mortgagors'

24

No. 55915-3-II

redemption period following a foreclosure sale for up to two years. *Id.* at 416-18. The Court stated that a law may not release or extinguish contractual obligations without violating the contract clause. *Id.* at 431. As a result, the contract clause may not be interpreted to "permit the state to adopt as its policy the repudiation of debts or the destruction of contracts or the denial of means to enforce them." *Id.* at 439. However, the Court stated that the constitutional prohibition against the impairment of contracts should be not be construed to prevent "*limited and temporary interpositions* with respect to the enforcement of contracts if made necessary by a great public calamity," including urgent public need related to economic causes. *Id.* (emphasis added).

Regarding the statute at issue, the Court noted that the mortgage debt was not impaired, the validity of the foreclosure sale and the mortgagee's ability to obtain a deficiency judgment were not affected, and the mortgagor was required to pay the rental value of the home during the extended possession. *Id.* at 445. "The mortgagee-purchaser during the time that he cannot obtain possession thus is not left without compensation for the withholding of possession." *Id.* Therefore, the Court held that the statute did not violate the contracts clause. *Id.* at 447.

2. Analysis

a. Substantial Impairment

To determine whether there is a substantial impairment of a contractual relationship, we consider "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen v. Melin*, ___ U.S. ___, 138 S. Ct. 1815, 1822, 201 L. Ed. 2d 180 (2018). All three considerations support the conclusion that the eviction moratorium does not substantially impair the appellants' contracts with their tenants.

25

No. 55915-3-II

First, the eviction moratorium did not undermine landlords' contractual bargain. The moratorium did not extinguish the contractual obligations of tenants to pay rent. Instead, the moratorium temporarily delayed landlords' ability to exercise the remedy of eviction for nonpayment of rent.

The appellants claim that the moratorium imposed a permanent prohibition against landlords treating any unpaid rent as an enforceable debt. However, this claim is inaccurate. The proclamations state that unpaid rent would not be an enforceable debt only if (1) nonpayment occurred after February 29, 2020, (2) "non-payment was as a result of the COVID-19 outbreak," and (3) the landlord failed to offer the tenant a reasonable repayment plan. Proclamation 20-19.1 at 4. Assuming a landlord offered a reasonable repayment plan, all unpaid rent would be an enforceable debt.

The appellants argue that allowing landlords to treat unpaid rent as an enforceable debt only if they offer a reasonable payment plan was illusory for landlords, like Horwath, whose tenants refused to communicate with them. They emphasize that the repayment plan condition required that the offered plan be "reasonable based on the individual financial, health, and other circumstances of that resident." Proclamation 20-19.1 at 4. According to the appellants, it would be impossible for landlords to offer the required repayment plan if they had no information regarding their tenants' "financial, health, and other circumstances" and no way of forcing tenants to provide such information.

However, a trial court assessing whether a prepayment plan was reasonable undoubtedly would base its assessment on the information available to the landlord. For example, the landlord could make assumptions based on the financial information about the tenants obtained at the inception of the lease. A trial court would not penalize a landlord by rendering unpaid rent

26

No. 55915-3-II

an unenforceable debt when the landlord made a good faith effort to design a reasonable repayment plan despite the tenant's failure to cooperate.

Second, the moratorium did not completely interfere with landlords' reasonable expectations. There is no question that the rental housing industry generally has been regulated heavily, such as in the Residential Landlord-Tenant Act, chapter 59.18 RCW, and the forcible entry and unlawful detainer statute, chapter 59.12 RCW. This pervasive regulation put landlords on notice that the government might intervene further in the landlord-tenant relationship.

Third, the eviction moratorium gave landlords the ability to safeguard and reinstate their rights. The moratorium was temporary, and following its expiration landlords retained all available remedies for nonpayment of rent. The moratorium merely delayed the exercise of those remedies. And as noted above, even during the moratorium landlords could treat unpaid rent as an enforceable obligation if they offered tenants a reasonable repayment plan.

Federal courts in Washington and in other jurisdictions have ruled that eviction moratoriums do not substantially impair contractual relationships between landlords and tenants. *E.g.*, *Jevons*, 2021 WL 4443084, at *8-9; *Heights Apts.*, 510 F. Supp. 3d at 808-09; *Auracle Homes*, 478 F. Supp. 3d at 224-25; *Elmsford Apt. Assocs.*, 469 F. Supp. 3d at 171-72.

We conclude that the eviction moratorium did not substantially impair the appellants' rental contracts.

b.    Reasonable and Necessary Means

Even if we were to assume that the eviction moratorium substantially impaired the appellants' contractual relationship with their tenants, the moratorium did not violate the contracts clause because it was "reasonable and necessary to serve a legitimate public purpose." *Lenander*, 186 Wn.2d at 414.

27

No. 55915-3-II

The appellants do not dispute that the eviction moratorium served a legitimate public purpose: to prevent widespread homelessness and the further spread of COVID-19. They argue only that the moratorium did not advance this purpose in an appropriate and reasonable manner. And they focus only on the fact that the eviction moratorium applied to all tenants, including those who suffered no economic hardship or inability to pay as a result of the COVID-19 pandemic.

However, this case does not involve government contracts, so we must defer to the governor's judgment as to the best way to achieve the compelling government purpose. *See Energy Reserves Grp.*, 459 U.S. at 413. Requiring tenants to prove financial hardship in order to stop eviction proceedings would create further uncertainty and would force tenants to expend limited personal and financial resources to maintain their homes. And some tenants may not have the ability to gather sufficient evidence to prove an inability to pay, and therefore would lose their homes despite suffering pandemic-related economic distress. Finally, requiring proof of financial hardship potentially would have created the need for thousands of tenants to appear in court, further risking exposure to and spread of COVID-19.

In addition, the governor's proclamations required tenants to pay rent if they had the financial resources to pay. Proclamation 20-19.1 and all subsequent proclamations contained the statement that "Tenants, residents, and renters who are not materially affected by COVID-19 should and must continue to pay rent, to avoid unnecessary and avoidable economic hardship to landlords, property owners, and property managers who are economically impacted by the COVID-19 pandemic." Proclamation 20-19.1 at 2.

We conclude that the temporary eviction moratorium was reasonable and necessary to serve the legitimate public purpose of preventing homelessness and the spread of COVID-19.

No. 55915-3-II

Accordingly, we hold that the eviction moratorium did not unconstitutionally impair the appellants' contractual relationship with their tenants.

CONCLUSION

We affirm the trial court's grant of summary judgment in favor of the State.

_____
MAXA, J.

We concur:

_____
WORSWICK, P.J.

_____
HULL, J.P.T.*

* Judge Kevin Hull is serving as a judge pro tempore of the court pursuant to RCW 2.06.150(1).

29